**Lawrence MILMAN, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**BOX HILL SYSTEMS CORP., Salomon Smith Barney Inc., Nationsbanc Montgomery Securities Inc., Philip Black, Benjamin Monderer, Carol Turchin, and Mark A. Mays, Defendants.**

**No. 98 CIV. 8640(SAS).**

United States District Court, S.D. New York.

Aug. 17, 1999.

Russell J. Gunyan, Milberg, Weiss, Bershad, Hynes & Lerach LLP, New York City, Lee S. Shalov, Shalov, Stone & Bonner, New York City, for Plaintiff.

Francis S. Chlapowski, Brobeck, Phleger & Harrison LLP, New York City, for

Defendants, Box Hill Systems Corp., Monderer, Turchin, Black, Mays.

Brad Karp, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Defendants, Salomon Smith Barney Inc. and Nationsbanc Montgomery Securities Inc.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Lawrence Milman, on behalf of himself and all others similarly situated, brings this securities fraud class-action lawsuit against Box Hill Systems Corp., a corporation in which Plaintiffs purchased stock through a public offering ("Box Hill" or "the Company"); Salomon Smith Barney Inc. and Nationsbanc Montgomery Securities Inc., investment banks serving as underwriters for that offering ("Underwriters" or "Underwriter Defendants"); and four officers of Box Hill whom Plaintiffs allege received substantial financial benefit as a result of the public offering ("the Individual Defendants").

Plaintiffs allege that Defendants violated sections 11, 12 and 15 of the Securities Act of 1933 by making false and misleading representations and by failing to disclose certain information in connection with and following a July 1997 public offering of Box Hill stock.[1] Defendants now move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiffs' Complaint in its entirety for failure to state a claim upon which relief may be granted. For the reasons that follow, Defendants' motions are denied in part and granted in part.[2]

## I. Standard of Review

Dismissal of a complaint pursuant to Rule 12(b)(6) is proper "only where it ap-

pears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief." *Scotto v. Almenas*, 143 F.3d 105, 109–10 (2d Cir.1998) (internal quotations omitted). "The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (internal quotations omitted). Thus, in deciding such a motion, the court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998). Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

In considering a Rule 12(b)(6) motion, the district court must limit itself to "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 661 (2d Cir.1996). In addition, in securities fraud actions, the court "may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC." *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991). *See also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991); *Salinger v. Projectavision, Inc.*, 934 F.Supp. 1402, 1405 (S.D.N.Y.1996).[3]

---

1. Plaintiffs' Complaint sets forth three claims. Claim I is against all Defendants for violation of § 11 of the Securities Act, 15 U.S.C. § 77k. Claim II is against all Defendants for violation of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l. Claim III is against the Individual Defendants for violation of § 15 of the Securities Act, 15 U.S.C. § 77o.

2. Box Hill and the Individual Defendants submitted a joint motion to dismiss the Complaint. The Underwriter Defendants submitted a separate motion to dismiss the Complaint.

3. In arguing their motions to dismiss, Defendants rely upon Box Hill's Form 10–Q filing for the period ending September 30, 1997 and Box Hill's Form 10–K filings for the periods

## II. Background

The following allegations, taken from the Consolidated Amended Class Action Complaint ("Complaint"), are presumed true for the purposes of this motion to dismiss.

Box Hill is a small high-technology company registered and based in New York. Complaint ¶ 5. Box Hill manufactures and sells computer storage hardware devices which are marketed primarily to high-end customers in data intensive industries such as financial, corporate and academic institutions. *Id.* ¶ 19. Box Hill also provides consulting and support services in connection with its products. *Id.*

From 1992 through 1996, the demand for Box Hill's products and services grew rapidly, and the Company experienced an increase of more than 233% in its annual sales revenue for the period December 1992 to June 1997. *Id.* ¶¶ 21, 24. Box Hill's products were particularly popular among New York-based financial institutions, because those customers tended to rely heavily on the types of product support services Box Hill offered. *Id.* ¶ 21. In addition, Box Hill was one of the few computer data storage companies based in New York (rather than California) during the early to mid–1990s. *Id.*

By the beginning of 1997, however, the market for computer data storage products began to experience significant change which negatively impacted Box Hill's sales. *Id.* ¶ 22. First, Box Hill's customers had become more sophisticated with respect to traditional data storage products such as SCSI and RAID.[4] *Id.* ¶ 35. As a result, they no longer required—and were no longer willing to pay for—the support services offered by Box Hill. *Id.* Instead, many of Box Hill's customers began to purchase lower-priced data storage products from mail-order catalogs or other manufacturers. *Id.* ¶ 35. Moreover, in early 1997, Box Hill's largest competitor, California-based Andataco, opened a New Jersey office in order to directly compete with Box Hill in the New York/New Jersey markets. *Id.* ¶ 41. In response to these changes in the market for data storage products, Box Hill was forced to lower its prices in order to remain competitive. *Id.* ¶ 38.

Second, in January 1997, Box Hill began to market and sell its newly developed next generation storage technology: "fibre channel products". *Id.* ¶ 34. Box Hill hoped these products would provide the Company with a new source of high-margin sales earnings to offset the decline in sales of the older SCSI and RAID products. *Id.* ¶ 36. However, the introduction of these new products was unsuccessful. *Id.* ¶ 37. Box Hill's customers were reluctant to invest in an expensive upgrade to the unproven fibre channel technology. *Id.*

On July 23, 1997, Box Hill filed a Form S–1 Registration Statement with the SEC for an initial public offering of Box Hill common stock ("Box Hill Offering" or "Offering"). *Id.* ¶ 15. Box Hill hired the Underwriter Defendants to act as co-lead underwriters for the Offering. *Id.* ¶ 7.

Prior to the Offering, Defendants went on a "Road Show" to promote Box Hill to the investment community. *Id.* ¶ 44. The Road Show included presentations by the Individual and Underwriter Defendants during which they spoke in positive terms about Box Hill's short and long term profits and made optimistic earnings projections for the remaining quarters of 1997 and into 1998. *Id.* Shortly after the Road Show, the Underwriters issued "booster shot" reports (favorable analyst reports) which again discussed Box Hill in highly positive terms. *Id.* ¶ 45.

---

ending December 31, 1997 and December 31, 1998. Although these documents were not attached to the Complaint, they are required public disclosure documents and thus properly considered by the Court.

**4.** SCSI and RAID are industry standard computer data storage devices.

On or about September 16, 1997, the prospectus for the Box Hill Offering ("Prospectus") became effective. *Id.* ¶ 16. Commencing on that date, Box Hill sold, through the Underwriter Defendants in a firm commitment underwriting, 6,325,000 shares of common stock at an offering price of $15 per share.[5] *Id.* ¶ 17. Of those shares, 3,150,000 were issued and sold to the Underwriters by Box Hill. Three of the four Individual Defendants (Mark A. Mays, Benjamin Monderer and Carol Turchin) who were executives and sole shareholders in the Company at all relevant times prior to the Offering, sold an additional 2,350,000 shares to the Underwriters. *Id.* ¶ 18.[6] Finally, the Underwriters purchased the remaining 825,000 common shares from Box Hill pursuant to an over-allotment option.[7] *Id.*

The total gross proceeds of the Offering were approximately $94.9 million of which Mays, Monderer and Turchin received $32.7 million. The Company received the remaining $56.6 million, after underwriters' fees and offering expenses of approximately $5.6 million. *Id.*

In early January 1998, unusual trading activity in Box Hill's stock prompted the New York Stock Exchange to request that Box Hill issue a public statement regarding its financial expectations. *Id.* ¶ 46. On January 8, 1998, Box Hill publicly announced that although it was "comfortable with consensus mean estimates for the 1997 fourth quarter" revenue, the Company considered consensus mean revenue estimates for its 1998 earnings to be "at the high end of the range." *Id.* The day after the announcement, Box Hill's stock declined 28% to $10.875 per share. *Id.* ¶ 47.

Plaintiffs allege that following the January 1998 announcement, the Company failed to make any disclosures from which investors could determine that Box Hill had persistent and long-range difficulties limiting the Company's ability to achieve the growth it projected at the time of the Offering. *Id.* ¶ 49. On February 17, 1998, Box Hill's CEO, Philip Black, appeared on the financial news television channel CNBC and stated that the Company was not experiencing margin pressures and that it expected solid growth in sales of its fibre channel products. *Id.* Three weeks later, on the business news television channel CNNfn, Black asserted that Box Hill expected to sustain its earlier growth rate of 35–45%. *Id.*

On April 14, 1998, Box Hill announced that its first quarter 1998 revenues and earnings per share would fall short of consensus estimates by 25% and 49% respectively. *Id.* ¶ 50. The following day, Box Hill shares fell 23% to approximately $10 per share. *Id.* ¶ 51. At the time Plaintiffs filed their original complaint in November 1998, Box Hill shares were trading at approximately $5 per share. *Id.*

On March 19, 1999, Plaintiffs filed the instant Complaint alleging violations under §§ 11, 12 and 15 of the Securities Act for omissions and material misrepresentations made by Defendants (i) during the pre-Offering Road Show; (ii) in the Prospectus; and (iii) after the time of the Offering. Plaintiffs allege that they purchased Box Hill stock pursuant to and in reliance upon Box Hill's Prospectus and the Defendants' oral representations, and that they were damaged when the value of the Box Hill stock subsequently declined. They seek money damages and recission of their stock purchases.

---

**5.** In a firm commitment underwriting, the issuer sells all shares in the offering to its underwriters at a discount price. The underwriters then have sole responsibility to resell those shares to investors at the full offering price.

**6.** The fourth Individual Defendant, Philip Black, apparently did not own stock in Box Hill prior to the Offering.

**7.** An over-allotment allows the underwriter to purchase additional shares of the issuing company's stock when customer allocations exceed the initial available supply of shares.

## III. Discussion

Plaintiffs' Complaint sets forth the following eight omissions or misrepresentations that they allege violate §§ 11 and 12 of the Securities Act: [8]

(a) Defendants failed to disclose that fibre channel products had not achieved market acceptance;

(b) Defendants failed to disclose that increased competition in Box Hill's core markets was causing sales growth to fall below expectations;

(c) Defendants failed to disclose that Box Hill was materially reducing prices at the time of the Offering;

(d) Defendants failed to disclose that Box Hill was experiencing a lengthening of its sales cycle;

(e) Defendants failed to disclose that Box Hill's sales force was understaffed and ineffective;

(f) Defendants failed to disclose that Box Hill's Washington, D.C. office was in disarray;

(g) Box Hill materially overstated the potential market for Windows NT fibre channel products;

(h) Box Hill's CEO made materially misleading statements in February and March 1998 regarding the Company's prospects for growth.

All but one of the alleged omissions or misrepresentations occurred prior to the Offering.

In their motions to dismiss, Defendants challenge the legal sufficiency of each alleged omission and misrepresentation as a basis for Plaintiffs' statutory claims. Defendants also raise a number of general defenses to those claims.

### A. Sections 11 and 12

Section 11 of the Securities Act, 15 U.S.C. § 77k, imposes liability when companies offering their shares to the public fail to provide required information, or include misleading statements, in their registration statements. Specifically, § 11 provides:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue ... every person who signed the registration statement ... [and] every underwriter with respect to such security.

15 U.S.C. § 77k(a).[9] Thus, to maintain a claim for failure to disclose information pursuant to § 11, a plaintiff must demonstrate both that the defendant had an affirmative duty to disclose the information and that the omitted information was material. *See In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir.1997) ("Before liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure.... Materiality alone is not sufficient to place a company under a duty of disclosure.").

---

**8.** Claim III of Plaintiffs' Complaint is against the Individual Defendants for violation of § 15 of the Securities Act. Section 15 imposes derivative liability on persons who "control" those liable under §§ 11 and 12. *See* 15 U.S.C. § 77o. Thus, if there is no underlying § 11 or § 12 liability, there can be no § 15 liability. *See SEC v. First Jersey Secs.*, 101 F.3d 1450, 1472 (2d Cir.1996). The Individual Defendants do not dispute that they are "controlling persons" under the statute.

**9.** Each of the Individual Defendants signed the registration statement, either personally or through an attorney. Complaint ¶ 6. In addition, each of the Individual Defendants was a director or officer of Box Hill at the time the registration statement was filed. *Id.; see also* 15 U.S.C. § 77k(a)(2) (§ 11 applies to "every person who was a director of (or person performing similar functions) ... the issuer at the time of the filing").

Specific disclosure requirements vary with the type of registration statement utilized by a company in its offering. In the instant case, Box Hill used SEC Form S–1. Form S–1 directs registering companies to comply with a wide array of regulations, including Item 303, 17 C.F.R. § 229.303 (1998). Item 303(3)(i) requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303 (1998). The instructions to the above-quoted portion of Item 303 explain that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id.*

Section 12 of the Securities Act, 15 U.S.C. § 77l, provides liability for oral or written statements made in connection with the public offering of securities. Section 12 provides:

> Any person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . shall be liable . . . to the person purchasing such security from him.

15 U.S.C. § 77l(a)(2). It is important to note that § 12 does not provide a general cause of action for all material misstatements made by a publicly owned and traded company. Rather, § 12 establishes a specific basis of liability for statements made in connection with the offering and sale of a security. *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 578, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("The intent of Congress and the design of the statute require that

§ 12 [ (a) ] (2) liability be limited to public offerings"). Unlike § 11, § 12 liability is not limited to material misrepresentations in a written registration statement.

■ The key phrase for purposes of this motion with respect to both § 11 and § 12 is misstatement or omission of a "material fact." *See In re Donna Karan International Securities Litigation,* No. 97–CV–2011, 1998 WL 637547, at *4 (E.D.N.Y. Aug. 14, 1998). Materiality is a mixed question of law and fact. *See In re TCW/DW North Am. Gov't Income Trust Sec. Litig.,* 95 Civ. 0167, 1997 WL 727487, at *4 (S.D.N.Y. Nov. 20, 1997). Although a court may dismiss a claim on the ground that an omission was not material, the standard for doing so is high: "[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985).

**B. General Defenses**

**1. Plaintiffs' Claims Are Not Time–Barred**

■ Defendants argue that all of Plaintiffs' claims are time-barred pursuant to § 13 of the Securities Act, 15 U.S.C. § 77m. Section 13 mandates that § 11 and § 12 claims be filed "within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Defendants base their argument on Box Hill's 10–Q filing for the quarter ended September 30, 1997 ("9/30/97 10–Q"). The 9/30/97 10–Q was filed more than one year before Plaintiffs filed their initial complaint in this action.[10] The 9/30/97 10–Q document states that "[Box Hill's] increase [in net revenue] resulted from an increase

---

10. Plaintiffs filed their initial complaint in November 1998.

in volume, primarily due to increased demand for the Company's products, which was partially offset by price reductions." *See* 9/30/97 10–Q, Ex. 6 to 5/3/99 Declaration of Francis S. Chlapowski ("Chlapowski Decl."), Counsel for Box Hill and Individual Defendants.

Defendants claim that because the quoted statement explicitly disclosed that price reductions had impacted the Company's net revenues, any reasonable investor was placed on notice that the Prospectus was misleading. Thus, Defendants' argument goes, this notice would bar all of Plaintiffs' claims because an investor need not be on notice of the entire wrongdoing to be estopped by the time-bar provisions of § 13. *See Dodds v. Cigna Sec.*, 12 F.3d 346 (2d Cir.1993).

In *Dodds*, however, the Court of Appeals held that facts sufficient to confer inquiry notice upon an investor for purposes of § 13 must rise to the level of "storm warnings" which "suggest to an investor of ordinary intelligence the probability that she had been defrauded." *Id.* at 350. In addition, courts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements. *See In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d 968 (2d Cir.1993).

I cannot conclude, as a matter of law, that the pricing statement contained in Box Hill's 9/30/97 10–Q is so clear a notice of wrongdoing as to constitute a "storm warning." This is especially so when drawing every inference in Plaintiffs' favor. The pricing disclosure, moreover, merely qualifies an optimistic statement announcing the increase in demand for Box Hill's products. Thus, Plaintiffs' claims are not time-barred pursuant to § 13.

## 2. The Individual Defendants Are "Sellers" for Purposes of § 12

Box Hill and the Individual Defendants assert that they are not statutory "sellers" under § 12, and therefore Claim II must be dismissed with respect to them.[11] I disagree.

As set forth above, § 12 applies to "[a]ny person who ... offers or sells a security". 15 U.S.C. § 77*l*(a)(2). Box Hill and the Individual Defendants assert that because the sale of Box Hill's shares was effectuated through the Underwriters in a "firm commitment" underwriting, they cannot qualify as statutory "sellers" under § 12. In a firm commitment underwriting, the issuer sells all the offering shares directly to its underwriters. The underwriters then turn around and sell those shares to investors. Thus, the issuer (Box Hill and the Individual Defendants) does not directly interact with investors (Plaintiffs).

Privity between a buyer and seller, however, is not an absolute prerequisite for "seller" status under § 12. *Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 616 (2d Cir.1994) ("Privity between the buyer and seller is no longer required in a § 12(2) action."). In *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir.1989), the Court of Appeals held that a collateral participant in the sale of securities is a "statutory seller" under § 12 if that participant solicited the sales in question motivated by a desire to serve his own financial interests.[12]

The determination of whether Box Hill and the Individual Defendants are "sellers" under § 12 involves at least two issues of fact: Did Box Hill and the Individual Defendants solicit sales of the

---

11. The Underwriter Defendants do not dispute their status as statutory sellers.

12. The *Wilson* court distinguished persons soliciting the sale of securities for their personal financial gain from persons, such as attorneys, performing merely ministerial tasks associated with an offering. Persons performing ministerial acts short of soliciting purchase of the stock do not qualify as statutory "sellers" under § 12. *See Wilson*, 872 F.2d at 1126–27.

Company's stock? And, if so, were they motivated by financial gain? The Complaint alleges that Box Hill and the Individual Defendants received millions of dollars in profits from the Offering. Plaintiffs also allege that Box Hill and the Individual Defendants hired the Underwriters and actively promoted the Company's stock to potential investors through their direct participation in the Road Show. These allegations, if true, would be sufficient to establish the Box Hill Defendants as statutory sellers under § 12. *See Degulis v. LXR Biotechnology, Inc.*, 95 Civ. 4204, 1997 WL 20832, at *6 (S.D.N.Y. Jan. 21, 1997); *In re Chaus Sec. Litig.*, 88 Civ. 8641, 1990 WL 188921, at *12 (S.D.N.Y. Nov. 20, 1990).[13]

## C. Misrepresentations and Omissions

As set forth above, Claims I and II of the Complaint involve eight misrepresentations and omissions. For ease of analysis, each statement is treated as a subpart of Claims I and II.

### (a) Defendants Failed To Disclose That Fibre Channel Products Had Not Achieved Market Acceptance

■ Plaintiffs assert that notwithstanding the obvious importance of fibre channel products to the continued vitality of Box Hill, Defendants failed to disclose that "Fibre Channel products, which by the time of the Offering had been on the market for nine months, had not gained market acceptance, particularly among the Company's existing customer base, and that the Company's earnings were being negatively impacted by the ability to secure these higher margin sales." Complaint ¶ 53(a).

If, as Plaintiffs allege, Defendants had specific knowledge prior to the Offering that Box Hill's fibre channel products were poorly received in their initial distribution, the broad requirements of Form S–1, and specifically Item 303(3)(1), would require that such information be disclosed. *See supra* Part III.A. Reasonable investors might certainly consider data from the initial market tests of an important new product line to be significant in their evaluation of a firm's prospects. Thus omission of such material could constitute a violation of the Securities Act.

Defendants argue that the Box Hill Prospectus "bespeaks caution" that the fibre channel products might not be accepted in the marketplace. Under the "bespeaks caution" doctrine, a misrepresentation or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable. *See Finkel v. Putnam Convertible Opportunities*, 162 F.3d 1147 (2d Cir.1998). Such cautionary language must be "too prominent and specific to be disregarded" and must "warn investors of exactly the risk that plaintiffs claim was not disclosed." *Olkey v. Hyperion*, 98 F.3d 2, 5 (2d Cir.1996).

Despite Defendants' assertions, the bespeaks caution doctrine does not apply here. The Prospectus states:

> The Company has begun shipping the Fibre Box principally for customer evaluation and has made limited sales to date ... The failure of the Fibre Box and other new products to adequately meet current preferences of the marketplace or achieve market acceptance could have a material effect on the Company's business.

*Jackson v. Oppenheim*, 533 F.2d 826, 830 n. 8 (2d Cir.1976). This minimal causal connection is adequately plead in the Complaint. Moreover, once such a connection is established, Plaintiffs need not assert actual reliance upon the Defendants' alleged misstatements. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 361 (2d Cir.1992).

**13.** Box Hill and the Individual Defendants also argue that Plaintiffs fail to adequately allege causation between the Defendants' alleged oral Road Show statements and Plaintiffs' purchases of Box Hill stock. However, § 12(a)(2) requires only that "some" causal connection be established between the alleged communication and the sale of securities *See*

Prospectus, Ex. 2 to Chlapowski Decl., at 7. The Prospectus further states:

> The Open Systems storage market in which the Company operates is characterized by rapid technological change, frequent new product introductions and evolving industry standards.... There can be no assurance that the Company will be successful in identifying, managing, developing, manufacturing, or marketing product enhancements or new products that respond to technological change or evolving industry standards.

*Id.* Although these statements constitute an adequate defense against charges that the Company failed to warn investors of the risks inherent in Box Hill's business strategy, Plaintiffs do not allege that Defendants failed to warn of such risks. Rather, Plaintiffs specifically charge that at the time of the Offering Defendants had actual—not hypothetical—knowledge that Box Hill's products were not being well received by customers. Such knowledge was never disclosed in the Prospectus.

Moreover, no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made. *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."). Accordingly, Claim I(a) and Claim II(a) cannot be dismissed at this stage of the proceedings.

**(b) Defendants Failed To Disclose That Increased Competition In Box Hill's Core Markets Was Causing Sales Growth To Fall Below Expectations**

Plaintiffs contend that, at the time of the Offering, Box Hill had lost several key customers to its competitors. As a result, Box Hill's sales were materially declining.

In response, Defendants argue (i) that the Prospectus made all necessary and proper disclosures concerning the competitive environment for Box Hill's products; and (ii) that the securities laws do not require a company to disclose information regarding sales results for a quarter in progress.

The Prospectus does make extensive disclosure regarding the risky and volatile competitive environment for Box Hill's products and services. The Prospectus minimizes neither the competency and resources of Box Hill's primary competitors, nor Box Hill's dependence upon a small concentration of customers in specific industries. *See* Prospectus at 9–10. However, the Prospectus does not reveal that sales were in material decline at the time of the Offering. Once again, hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge.

As for the duty to disclose, Item 303 requires companies to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable *impact on net sales ...*" 17 C.F.R. § 229.303 (1998) (emphasis added). Plaintiffs allege that Defendants had knowledge prior to the Offering of just such a trend. Thus, for purposes of this motion, Defendants' had an affirmative duty to disclose the declining sales trend.

Moreover, Plaintiffs allege that the Underwriters and Individual Defendants made affirmative "highly positive" representations regarding the Company's future earnings during the Road Show and in subsequent "booster shot" reports. Complaint ¶¶ 44, 45. Arguably, pursuant to § 12, the Plaintiffs were required to disclose the declining sales trends to render their affirmative representations "not misleading".

Accordingly, Claim I(b) and Claim II(b) cannot be dismissed as a matter of law.

### (c) Defendants Failed To Disclose That Box Hill Was Materially Reducing Prices At The Time Of The Offering

Plaintiffs allege that Defendants' "boilerplate risk disclosure" failed to acknowledge the existence of severe pricing pressures and that these pressures caused the Company to materially lower product prices at the time of the Offering. Neither allegation is actionable as a matter of law.

Unlike subpart (b) above, here the extensive and specific warnings included in the Prospectus cannot be considered merely boilerplate. The Prospectus explicitly cautions investors as to present and continuing pricing pressures affecting the Company:

> Competitive Pricing—Competitive pricing pressures exist in the data storage market, and have had and may in the future have an adverse effect on the Company's revenues and earnings. There has also been, and may continue to be, a willingness on the part of certain large competitors to reduce prices in order to preserve or gain market share, which cannot be foreseen by the Company. The Company believes that pricing pressures are likely to continue as competitors develop more competitive product offerings.

Prospectus at 10. The Company fully disclosed that these pressures were a current reality—not a hypothetical possibility. No reasonable investor could doubt that Box Hill was in a volatile and competitive market at the time of the Offering. Accordingly, the "Competitive Pricing" section of the Prospectus satisfies the Company's duty to disclose "trends or uncertainties" with respect to pricing pressures. 17 C.F.R. § 229.303 (1998).

Although the Prospectus does not disclose that these pressures had in fact caused Box Hill to lower prices just prior to the Offering, the Company was under no affirmative duty to disclose such information. The price reductions had occurred during the same accounting period in which the Prospectus was released, and the securities laws do not require a company to disclose pricing data for the quarter in progress. In fact, Item 303(b) (Management's discussion and analysis of financial condition and results of operation) specifically states that the effect of "changing prices on operations for interim periods need not be addressed." 17 C.F.R. § 229.303(b) (1998). Moreover, disclosure of such information was not necessary under § 12 to render an affirmative representation "not misleading". In light of the disclosures made in the "Competitive Pricing" section of the Prospectus and the explicit statutory waiver in Item 303, Box Hill's failure to disclose its lowered prices is not an actionable omission. Accordingly, Claim I(c) and Claim (II)(c) are dismissed.

### (d) Defendants Failed To Disclose That Box Hill Was Experiencing A Lengthening Of Its Sales Cycle

■ Plaintiffs allege that at the time of the Offering several of Box Hill's largest customers had deferred purchasing decisions causing a "material lengthening in [Box Hill's] sales cycle which was stretching out [Box Hill's] revenue stream." Complaint ¶ 56(e). Again, Defendants counter that the Prospectus properly bespeaks caution on the matter and that no material information was omitted.

The Prospectus is not entirely clear as to the risk of sales cycle revenue pressures. The Prospectus states that "[t]he Company generally does not enter into long-term contracts with its customers, and customers generally have certain rights to extend or delay the shipment of their orders or to cancel orders without penalty." Prospectus at 9. Nowhere does the Prospectus divulge that the sales cycle problem was a present reality at the time of the Offering.

If, in fact, the Company was in the grip of a sales cycle extension that was materially affecting revenues—something that must be presumed at this motion to dismiss stage—then the broad disclosure requirements of Item 303 would mandate that such information be released to the public. Moreover, a question of fact exists as to whether defendants were required to disclose information regarding sales cycle extension in order to render the affirmative representations in the Prospectus and at the Road Show not misleading. Accordingly, the motion to dismiss Claim I(d) and Claim II(d) is denied.

### (e) Defendants Failed To Disclose That Box Hill's Sales Force Was Understaffed And Ineffective

Plaintiffs allege that, as a result of the under-staffing and ineffectiveness of Box Hill's sales force, the Company had lost market share and revenue in several product sectors. According to Plaintiffs, these problems also accounted for Box Hill's inability to sell the recently introduced fibre channel products. Complaint ¶ 56(f).

The Prospectus notes that Box Hill's expansion "may place a significant strain on its ... sales and customer service functions." Prospectus at 9. It also states that "[t]here can be no assurance that the Company will be able to manage expansion successfully." *Id.* There is, however, no statement which discloses that the sales force was actually inadequate at the time of the Offering. *Id.*

■ There is no affirmative duty to disclose managerial incompetence: "Where the incremental value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts." *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 640 (3d Cir.1989).

■ Although managerial incompetence is not a necessary disclosure, a company engaging in the public offering of its shares is under an affirmative obligation to disclose any specific material consequence of that incompetence. *See Karan,* 1998 WL 637547, at *9 ("[T]he mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant ... failed to disclose a specific material fact resulting from that mismanagement.").

However, because Plaintiffs allege no such material consequence of the alleged mismanagement, there can be no violation under § 11 or § 12. As a result, Claim I(e) and Claim II(e) are dismissed.

### (f) Defendants Failed To Disclose That Box Hill's Washington D.C. Office Was In Disarray

■ Plaintiffs allege that Box Hill's Washington D.C. office, which formed the most significant part of the Company's expansion program, was in disarray. Plaintiffs claim the office lacked management throughout a significant part of 1997, and that the Company was considering closing the office.

These allegations do not present the sort of present occurrence that demands disclosure beyond the general warnings provided in the Prospectus. Requiring companies to disclose options they are considering would risk "bury[ing] the shareholders in an avalanche of trivial information." *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 810 (2d Cir.1996) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 448, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).[14]

The second piece of this allegation, that Defendants failed to disclose that the Washington, D.C. office was in disarray, is nothing but an additional claim of mismanagement. Similar to the discussion of subpart (e) above, Plaintiffs allege no specific material consequences resulting from mis-

---

14. The Washington, D.C. office was, in fact, never closed.

**234**

management of the Washington, D.C. office. Therefore, Claim I(f) and Claim II(f) are dismissed.

### (g) Box Hill Materially Overstated The Potential Market For Windows NT Fibre Channel Products

Plaintiffs allege that Defendants materially misled investors by overstating the potential market for their products. Specifically, Plaintiffs assert that the large market for Windows NT based fibre channel storage devices never materialized as predicted in the Prospectus.

The only reference in the Prospectus to the potential market for Windows NT devices is the following statement: "IDC estimates that the worldwide market for RAID storage systems in Windows NT environments will grow at a compounded annual rate of 34.1%." Prospectus at 3. However, this statement, even if false, does not constitute an actionable misstatement.

Projections and general statements of optimism are only actionable under specific circumstances:

> A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. A projection or statement of belief may be actionable to the extent that one of these implied factual assertions is inaccurate.

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989).

Plaintiffs allege no facts which would render the optimistic statement regarding Windows NT actionable under §§ 11 and 12. Plaintiffs never allege that the Defendants did not believe the veracity of IDC's prediction. Nor do Plaintiffs allege that Defendants had reason to doubt the statement's veracity. The Windows NT market size statement is explicitly worded as a prediction—by an independent third party—and could never be reasonably read as a guarantee. *See In re International Business Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998) ("Statements regarding projections of future performance may be actionable . . . if they are worded as guarantees"). Accordingly, Claim I(g) and Claim II(g) are dismissed.

### (h) Box Hill's CEO Made Materially Misleading Statements In February And March 1998 Regarding The Company's Prospects for Growth

Plaintiffs seek to impose liability for statements made by Defendants after the completion of the Box Hill Offering. Specifically, Plaintiffs allege that the statements made by Box Hill's CEO Philip Black on CNBC and CNNfn were misleading regarding the Company's prospects for growth and thus actionable under §§ 11 and 12. Defendants assert that Black's statements are not actionable under either statute because they were made subsequent to the Offering.

As set forth above, the plain language of § 11 limits claims to those arising from the printed text of the registration statement. *See supra* Part III.A. Thus, there are no grounds for § 11 liability for oral statements made prior to or after a public offering.

Similarly, statements made after the date of the Box Hill Offering are not actionable under § 12. Section 12 imposes liability only for those statements made in connection with the public sale of securities. Black's comments occurred after the Offering and therefore his comments could only have impacted the secondary market for Box Hill's shares. That market is not the proper subject of a § 12 claim. Claim I(g) and Claim II(g) are dismissed.

### IV. Conclusion

Defendants' motions to dismiss are denied in part and granted in part. All

claims pertaining to statements made by Defendants after the time of the Offering are dismissed. Furthermore, the claims alleging that Box Hill failed to disclose its reduction in prices, the state of the Washington, D.C. office, and information concerning its sales· force, and misstated the potential market for Windows NT based storage devices are dismissed. As § 15 liability depends upon a valid underlying § 11 or § 12 claim, the § 15 claims related to the dismissed claims are dismissed as well. All other claims stated in the Complaint are upheld at this preliminary stage. A conference is scheduled for August 31, 1999 at 11:30 a.m.