### In re: INDEPENDENT ENERGY HOLDINGS PLC SECURITIES LITIGATION

**This Document Relates To: All Cases**

**No. 00 CIV.6689 (SAS).**

United States District Court,
S.D. New York.

July 26, 2001.

---

Jeffrey A. Klafter, Gerald H. Silk, Victoria O. Wilheim, Bernstein Litowitz Berger & Grossman LLP, New York, NY, for Lead Plaintiffs.

Lawrence Portnoy, Helen Harris, Davis Polk & Wardwell, New York, NY, for Donaldson, Lufkin & Jenrette Securities Corporation, Prudential Securities Incorporated, Johnson Rice & Company L.L.C., Donaldson, Lufkin & Jenrette International, and Donaldson, Lufkin & Jenrette, Inc.

Steven R. Schindler, Jonathan L. Hochman, Jeremy M. Weintraub, Schindler Cohen & Hochman LLP, New York, NY, for Jerry W. Jarrell, Robert E. Jones, Burt H. Keenan, Herbert L. Oakes, Ian Stewart, and John L. Sulley.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This is a securities class action[1] brought on behalf of all persons, other than defendants, who purchased or otherwise acquired American Depository Shares ("ADSs") and Ordinary Shares of Independent Energy Holdings PLC ("Independent Energy" or "Company") in a March 28, 2000 secondary offering ("Secondary Offering") of 4.07 million ADSs and on the open market during the class period which extends from February 14, 2000 until September 8, 2000 ("Class Period"). Plaintiffs have sued the Company, the underwriters of its Secondary Offering ("Underwriter Defendants"), two companies related to one of the Underwriter Defendants (the "Related Defendants"), and several officers and directors of the Company ("Individual Defendants"), asserting claims arising under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, and sections 10(b)(5) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Now pending are two separate motions to dismiss, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, filed by the Individual Defendants, and the Underwriter and Related Defendants.[2]

This case illustrates that motions to dismiss in securities fraud cases have become all too common where the procedural posture of the case renders most of the defendants' arguments futile. Many motions to dismiss ask the court to engage in judgment calls which are better made by the trier of fact. Cf. Gallagher v. Delaney, 139 F.3d 338, 342 (2d Cir.1998) (stating that the determination of whether "borderline situations" should be characterized as sexual harassment and retaliation is best left to a jury, not the court). While Congress has acted to discourage the filing of strike

---

1. This action is the consolidation of eighteen separate actions brought between September 6, 2000 and February 7, 2001.

2. Although served, the Company has neither answered the complaint nor filed a motion to dismiss. See Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Second Consolidated Amended Class Action Complaint ("Pl.Opp.") at 1 n. 3.

suits, nothing Congress has done suggests that the general principles of a motion to dismiss are no longer applicable in securities fraud cases. In affirming dismissals in securities fraud cases, the decisions of our Court of Appeals must not be mistaken for license to draw inferences which a district court is not permitted to draw on a motion to dismiss. Rather, in deciding a motion to dismiss, a court must be mindful that all reasonable inferences are to be drawn in the plaintiffs' favor. This general principle of law makes certain questions—such as whether alleged misstatements and omissions in a prospectus were material to a reasonable investor—difficult to resolve as a matter of law. *See Klein v. PDG Remediation, Inc.,* 937 F.Supp. 323, 327 (S.D.N.Y.1996) ("[I]t is unlikely, as a matter of law, that a cause of action can be dismissed which requires a determination of materiality.").

## I. LEGAL STANDARD

Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) ("The task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.") (quotation marks and citation omitted). Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d

65, 70 (2d Cir.1996) (quotation marks and citation omitted).

■ To properly rule on a 12(b)(6) motion, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences therefrom in the nonmovant's favor. *See Harris,* 186 F.3d at 247. The Court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999). However, the Court may also consider documents, while not explicitly incorporated into the complaint, that "plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 44 (2d Cir. 1991)).

## II. BACKGROUND

### A. The Parties

Independent Energy is the holding company for Independent Energy UK, its wholly owned subsidiary.[3] *See* Second Consolidated Amended Class Action Complaint ("SAC") ¶ 22. Independent Energy was an electric company that had the right to supply electricity in the United Kingdom ("U.K.") pursuant to a license granted it under the Electricity Act of 1989. *See id.* ¶ 23.

Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ Securities"), one of the Underwriter Defendants, is a national investment and merchant bank. *See id.* ¶ 35. DLJ Securities sold and distributed to the investing public Independent Energy ADSs pursuant to the Secondary Offering. *See id.*

---

**3.** Throughout this Opinion, Independent Energy and Independent Energy UK are collec-

tively referred to as "Independent Energy" or the "Company".

DLJ Securities is a wholly owned subsidiary of Donaldson, Lufkin & Jenrette, Inc. ("DLJ Inc."), one of the Related Defendants. *See id.* DLJ Inc. is an integrated investment and merchant bank serving clients both in the United States and internationally. *See id.* ¶ 34.

Another of DLJ Inc.'s wholly owned subsidiaries is Donaldson, Lufkin & Jenrette International ("DLJ International"), also a Related Defendant in this action. DLJ International frequently served as a financial advisor to the Company. *See id.* ¶ 36.

The other two Underwriter Defendants are Prudential Securities Incorporated ("Prudential") and Johnson Rice & Company L.L.C., Inc. ("Johnson Rice"). Prudential is a fully-diversified securities firm which provides, among other things, underwriting services. *See id.* ¶ 37. Johnson Rice is a securities boutique specializing in energy and oil service companies. *See id.* ¶ 38. Both Prudential and Johnson sold and distributed to the investing public Independent Energy ADSs in connection with the Secondary Offering. *See id.*

The Individual Defendants are John L. Sulley, Burt H. Keenan, Herbert L. Oakes, Ian Stewart, Jerry W. Jarrell, Robert E. Jones, and David O. May.[4] Each Individual Defendant was a Director of the Company's Board of Directors ("Board") and each signed the Company's March 28, 2000 registration statement and prospectus ("Prospectus"). *See id.* ¶¶ 26–32. In addition, Sulley was the Company's Chief Executive Officer ("CEO"); Jones was its Operations Executive; Stewart was Independent Energy's Finance Executive; and Oakes was

a Non–Executive Chairman of the Board. *See id.* ¶¶ 26, 28–30. Most of the Individual Defendants also owned Ordinary Shares of Independent Energy. Sulley owned 420,000 Ordinary Shares, approximately 1.1% of the Company's Ordinary Shares issued and outstanding; Keenan, a founder of the Company, owned 1,164,125 Ordinary Shares (approximately 3.1%); Jones owned over 354,200 Ordinary Shares; Jarrell owned 235,100 Ordinary Shares; and May owned 130,000 Ordinary Shares. *See id.* ¶¶ 26–28, 31, 32.

### B. The Company's Background

Founded in 1996, Independent Energy was formed to capitalize on the market opportunities created by the deregulation of the U.K. energy markets.[5] *See id.* ¶ 77. The Company quickly grew to become the largest independent supplier of electricity in the U.K. *See id.* It operated primarily as a marketer of energy, purchasing electricity from the "Electricity Pool", which serves as a market place for buying and selling electricity in England and Wales, and then reselling electricity to its own customers. *See id.* ¶¶ 54, 79. In order to participate in the Electricity Pool as a purchaser of electricity, Independent Energy was required to post a letter of credit good for twenty-eight days of electricity trading. *See id.* ¶¶ 54, 55.

### 1. The Company's Billing Problems

In 1999, Independent Energy entered the market for small business and residential customers, generally known as the sub–100 kilowatt ("kW") market. *See* Prospectus at 6, 7.[6] In October 1999, the Company began experiencing problems

---

**4.** Plaintiffs have not yet succeeded in serving May. *See* Pl. Opp. at 1 n. 3.

**5.** Deregulation and privatization of the energy markets in the U.K. began with the passage of the Electricity Act of 1989.

**6.** Although plaintiffs have not attached the Prospectus to the SAC, the Court may properly consider this document on a motion to dismiss. *See Cortec Indus.,* 949 F.2d at 47.

billing their customers in the sub–100 kW market. *See* SAC ¶ 92. The Company and Vertex Data Science Limited ("Vertex"), a third party service provider to which the Company had outsourced a large part of its billing and customer service operations, could not process and produce timely and accurate bills to the Company's customers. *See id.* ¶ 3. The seriousness of the Company's billing problems and the corresponding growing number of customers lodging complaints against the Company drew the attention of the Office of Gas & Electricity Markets ("OFGEM"), U.K.'s energy regulator. *See id.* ¶¶ 4, 97. From December 1999 through March 2000, OFGEM held weekly meetings with Sulley and other Company officials expressing serious concerns over the Company's billing and customer service problems. *See id.* ¶ 97. During those meetings, OFGEM also informed the Company that if it did not adequately remedy these problems, regulatory action against the Company would be taken. *See id.* ¶¶ 5, 97–99. Furthermore, at a meeting in February 2000, OFGEM informed the Company that its billing problems were not an "industry problem", as Independent Energy had contended, but rather, were distinct to the Company and its inadequate systems and procedures. *See id.* ¶ 104.

### 2. The Company's Attempt to Solve Its Billing Problems Fails

In January 2000, the Company attempted to modify the software employed by Vertex to improve its billing operations. *See id.* ¶ 100. However, these modifications were not improving the situation. *See id.* Indeed, notwithstanding these modifications, OFGEM informed the Company in mid-February 2000 that its investigation was now a "formal investigation", the highest level of investigation possible. *See id.* ¶¶ 6, 102. Plaintiffs contend that

by this date, the Company, Sulley, and other senior officials of the company "knew the highly likely consequences of OFGEM's investigation based upon a similar investigation OFGEM had conducted three months earlier against Northern Electric, another licensed electricity provider in the U.K., and the resulting sanction OFGEM had imposed against Northern Electric based upon its billing system failures and customer complaint levels." *Id.* ¶ 6.

In a meeting in early March 2000, OFGEM informed the Company of its concerns that the new software modifications were not working and that the Company's billing problems were intensifying. *See id.* ¶ 111. Indeed, during February and early March 2000, the situation deteriorated to the point where 50% of the Company's customer complaints were not being answered. *See id.* ¶ 109. Then, in mid-March 2000, shortly prior to the Secondary Offering, OFGEM, in response to its increasing concerns, instituted a formal reporting process which required the Company to send OFGEM weekly written reports regarding billing and complaints. *See id.* ¶ 112.

### 3. The Company's Liquidity Problems

The Company's problems in the sub–100 kW market began to impact its liquidity. *See id.* ¶ 113. Toward the end of February 2000, the Company was forced to seek additional credit and to post a ninety-day £60 million letter of credit in order to continue purchasing wholesale electricity. *See id.* ¶ 114. In connection with the issuance of the letter of credit, the Company and the Company's banker—Barclays Bank PLC—entered into agreements with DLJ Inc. "to reimburse Barclays for amounts drawn down under the letter of credit." *Id.* ¶ 115. Pursuant to this agreement, DLJ Inc., among other things,

received the Company's agreement that, if the Secondary Offering was not completed by April 30, 2000, the Company would issue DLJ Inc. warrants to purchase 5 million of its Ordinary Shares, or approximately 12% of the Company's equity, for 1 pence per share. *See id.* ¶ 116. The Company also agreed to pay DLJ Inc. $2.90 million in fees in connection with this line of credit guarantee. *See id.* ¶ 117.

## C. Independent Energy's Secondary Offering and Continuing Problems

On March 28, 2000, Independent Energy's Prospectus for its Secondary Offering became effective. *See id.* ¶ 118. The following day, the Company announced that the ADSs would be priced at $49.25 per ADS. *See id.* Following the completion of the Secondary Offering, the Company raised approximately $157.6 million. *See id.*

In connection with the Secondary Offering, three of the Individual Defendants—Sulley, Keenan, and Jones—sold their Ordinary Shares of Independent Energy as ADSs and realized over $30 million dollars in proceeds.[7] *See id.* ¶¶ 26–28. DLJ International sold 250,000 Ordinary Shares of Independent Energy, which constituted 100% of its securities investment in the Company. *See id.* ¶¶ 36, 220. By this transaction, DLJ International realized proceeds of $12.31 million. *See id.* ¶ 36. The Underwriter Defendants received $8.90 million in fees for their underwriting services.[8] *See id.* ¶¶ 35, 37, 38, 118.

Even following the Secondary Offering, the software modifications were still not functioning properly and the Company's billing problems were not improving. *See id.* ¶ 129. As a result, by April or May 2000, the Company attempted to transfer a substantial part of its billing operations to an in-house facility dubbed "Garret's Green." *Id.*

On May 3, 2000, OFGEM met with senior officials of the Company, including Sulley and Oakes, to discuss the Company's continued billing and customer service problems. *See id.* ¶ 119. At that meeting, the Company agreed to an OFGEM-imposed license condition. *See id.* That license condition, announced on May 10, 2000, prohibited the Company from taking on any new business in the sub–100 kW market. *See id.* ¶ 121. In the two days following the announcement, Independent Energy ADSs fell 34%, from $39 per ADS to $25.62 per ADS. *See id.* ¶ 124.

The Company's continuing billing and cash collection problems created even greater cash flow pressures. *See id.* ¶ 144. Consequently, on September 8, 2000, the Company announced that receivers had stepped in on behalf of the Company's lenders and had begun to liquidate the Company. *See id.* ¶¶ 14, 144. Independent Energy ADSs were halted at $7.56 per ADS. When the Company started trading again on the NASDAQ on October 19, 2000, its ADSs opened at $0.125 per share. *See id.* ¶ 14. As of March 20, 2001, Independent Energy ADSs were trading at $0.005 per share on the over-the-counter market. *See id.* ¶ 146.

---

7. Specifically, Sulley and Jones each sold 60,-000 shares at $49.25 per share and realized proceeds of $2.95 million, while Keenan sold 500,000 shares—approximately 43% of his total holdings in the Company—at $49.25 per share and realized proceeds of $24.62 million. *See* SAC ¶¶ 26–28, 216.

8. Specifically, DLJ Securities earned approximately $5 million in fees for its underwriting services; Prudential earned approximately $2.25 million in fees; and Johnson Rice earned approximately $1.80 million in fees. *See id.* ¶¶ 35, 37, 38.

**D. Defendants' Misrepresentations and Omissions**

**1. Alleged Misrepresentations and Omissions in the Prospectus**

The SAC sets forth the following five misstatements or omissions in the Prospectus which plaintiffs allege violate the securities laws:

a. The Prospectus falsely assured investors that the Company had developed system modifications which were likely to correct the Company's billing problems;

b. The Prospectus falsely attributed its billing delays to poor information flow from the regional electricity companies ("RECs"), responsible for reading customer's meters within a particular franchise area;

c. The Prospectus failed to disclose the scope of the Company's collection problems;

d. The Prospectus failed to disclose the high volume of complaints lodged against the Company by customers and the inability of either the Company or Vertex to handle customer inquiries;

e. The Prospectus failed to disclose that the Company was under investigation by OFGEM, and that it faced a serious risk of sanctions.

**2. Alleged Misrepresentations and Omissions in Other Publicly–Made Statements**

Plaintiffs also allege that throughout the Class Period, the Company and the Individual Defendants issued press releases and made statements that misrepresented and omitted material facts. Specifically, the SAC alleges that the following thirteen statements misrepresented or omitted material facts then known to the Company:

a. The Company's February 14, 2000 press release stating that it "wishes to make clear that successful action is being taken to resolve the billing issue, which relates to only one part of the business. The problem is only one of timing of billing and does not reflect any problem in collection." SAC ¶ 191.

b. A February 14, 2000 report issued by Brean Murray & Co., Inc. ("Brean Murray") which, based upon conversations with Company management and the Company's February 14, 2000 press release, maintained its BUY rating on the Company and stated that the billing problem "is an industry wide problem caused by the RECs." *Id.* ¶ 192.

c. On February 15, 2000, Sulley was quoted in an article stating that the billing problem would have only a "minimal" effect on profits, that "it's an industry problem", and that "[m]ost of the backlog has been cleared up." *Id.* ¶ 193.

d. On February 16, 2000, the Company's press release assured investors that "substantial progress on billing issues" was being made, and that the Company "has put in place procedures to overcome the data problems which continue to affect the industry in general." *Id.* ¶ 195.

e. On February 17, 2000, DLJ Securities issued a report that rated the Company as a BUY and stated that the Company "has resolved the billing problems surrounding its small business/domestic market", and that "the billing problems arose because of the poor transfer of data from the [RECs]". *Id.* ¶ 196.

f. On May 1, 2000, DLJ Securities issued a report which stated that based on its recent conversation with man-

agement, Independent Energy "is on track to be completely caught up [on its billing] by the end of June." *Id.* ¶ 198.

Even following the announcement of OFGEM-imposed license condition, the Company and its officers issued allegedly misleading statements:

g. On May 10, 2000, Sulley falsely stated in a press release that "[w]e anticipate substantially completing the backlog by the end of June" and that the Company was "confident" that it would "resolve its customer service problems to provide an improved and superior service" "within a short space of time". *Id.* ¶¶ 127, 199.

h. On May 10, 2000, a Brean Murray report based upon a conversation with Sulley stated that there "is unlikely to be any real negative fallout [from the license condition] as many of [the Company's] problems are industry wide . . . ." *Id.* ¶ 200.

i. On May 17, 2000, Sulley stated that he expects the billing problems "will be largely resolved within a short period". *Id.* ¶¶ 131, 201.

j. On May 17, 2000, the Company also stated that it "believes that it now has in place a specific strategy, which includes the new system of validating the front end data and cleaning the backlog of data, to ensure that future bills are dealt with efficiently and effectively." *Id.* ¶ 201.

k. On May 17, 2000, defendant Sulley stated: "[T]he worst was now behind the company with measures in place that would resolve the situation 'within a short period.'" *Id.* ¶¶ 133, 202.

l. On May 18, 2000, Sulley was quoted saying: "[W]e are solving the billing problems" and that the license condition "doesn't have an impact on ongoing profit or turnover." *Id.* ¶¶ 135, 203.

m. On May 18, 2000, Johnson Rice issued an analyst report, based upon a conference call with the Company's management, which stated that "[t]here are no 'collection' problems, only timing and information problems." *Id.* ¶ 204.

## III. DISCUSSION

### A. Section 11 and Section 12 Claims

In Count I of the SAC, plaintiffs charge the Company, the Individual Defendants, and the Underwriter Defendants with violations of section 11 of the Securities Act based on misrepresentations and omissions in the Prospectus. *See id.* ¶¶ 147–171. Count II charges the Company, DLJ International, the Underwriter Defendants, and certain of the Individual Defendants with violations of section 12(a)(2) of the Securities Act based on the misrepresentations and omissions in the Prospectus.[9] *See id.* ¶¶ 172–181.

Section 11(a) provides that certain specified persons, including every person who signed the registration statement and every director of the issuer, may be sued "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading" by any person "acquiring such security (unless it is proved that at the time of such acquisition he knew of such

9. Of the Individual Defendants, only Sulley, Keenan, and Jones are charged with viola- tions of section 12(a)(2).

untruth or omission)." 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability on any person who "offers or sells" a security by means of a prospectus that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C § 77*l*(a)(2). Thus, to state a claim under either sections 11 or 12(a)(2), plaintiffs must demonstrate that the Prospectus contained an untrue statement of material fact or omitted to state a material fact necessary to make the statements therein not misleading. *See In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023, 2001 WL 286758, at *3 (S.D.N.Y. Mar.23, 2001). Plaintiffs need not, however, plead scienter as sections 11 and 12(a)(2) impose strict liability for materially false statements or omissions. *See Degulis v. LXR Biotechnology, Inc.*, No. 95 Civ. 4204, 1997 WL 20832, at *3 (S.D.N.Y. Jan.21, 1997).

### 1. Actionable Misstatements and Omissions of Material Fact in the Prospectus

The moving defendants contend that plaintiffs' claims under sections 11 and 12(a)(2) should be dismissed because none of the alleged misstatements and omissions in the Prospectus are actionable. In determining whether the Prospectus contained an actionable misstatement or omission of material fact, this Court must be guided by certain principles, four of which are relevant here.

#### a. General Principles

#### i. Materiality

■ A misrepresentation of fact is material when an investor would attach importance to it in making an investment decision. *See Steinberg v. PRT Group, Inc.* 88 F.Supp.2d 294, 300 (S.D.N.Y.2000).

An omission is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir.1998) (quotation marks and citation omitted).

■ While a court may dismiss a claim on the ground that a misstatement or omission was not material, the standard for doing so is high. A complaint may not properly be dismissed unless the alleged misstatements and omissions " 'are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.' " *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir.2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

#### ii. The Prospectus

■ The Second Circuit has made clear that in determining whether statements contained in a prospectus are materially misleading, the prospectus may not be parsed, but rather, must be read as a whole:

> [T]he central issue is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities. A prospectus will violate federal securities laws if it does not disclose material objective factual matters or buries those matters beneath other information, or treats them cavalierly.

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996) (quotation marks, citations, and alterations omitted).

### iii. Forward–Looking Statements

The Private Securities Litigation Reform Act ("PSLRA"), which Congress passed in 1995, has added to the Securities Act a safe harbor that provides protection from liability based on forward-looking statements. *See* 15 U.S.C. § 77z–2(c). The PSLRA establishes a two-pronged analysis for determining when corporate entities and persons will be insulated from liability for forward-looking statements that prove to be incorrect. *See Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* No. 99 Civ. 12046, 2001 WL 300733, at *4 (S.D.N.Y. Mar.28, 2001). The PSLRA first looks to the statement itself and grants protection to the forward-looking statement if it is (i) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements" or (ii) "immaterial." 15 U.S.C. § 77z–2(c)(1)(A); *see also Harris v. Ivax Corp.,* 182 F.3d 799, 803 (11th Cir.1999). In a second and alternative prong, the PSLRA looks to the state of mind of the person making the disclosure and grants protection if the plaintiff cannot prove that the forward-looking statement, even if unaccompanied by cautionary language, was made "with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 77z–2(c)(1)(B); *see also Credit Suisse First Boston Corp.,* 2001 WL 300733, at *4.

### iv. The "Bespeaks Caution" Doctrine

■ The PSLRA's safe harbor was modeled in part after, but not meant to displace, the judicial "bespeaks caution" doctrine. *See Credit Suisse First Boston Corp.,* 2001 WL 300733, at *5. Under the bespeaks caution doctrine, a misstatement or omission will be considered immaterial if cautionary language is sufficiently specific to render reliance on the false or omitted statement unreasonable. *See Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 230 (S.D.N.Y.1999).

■ This doctrine only applies to forward-looking statements. *See Steinberg,* 88 F.Supp.2d at 301. The doctrine does not apply to misstatements or omissions concerning historical or current facts. *See In re APAC Teleservice, Inc. Sec. Litig.,* No. 97 Civ. 9145, 1999 WL 1052004, at *8 (S.D.N.Y. Nov.19, 1999).

■ Moreover, the bespeaks caution doctrine is only applicable where the cautionary language " 'warn[s] investors of *exactly* the risk that plaintiffs claim was not disclosed.' " *Milman,* 72 F.Supp.2d at 230 (emphasis added) (quoting *Olkey,* 98 F.3d at 5). *See also Steinberg,* 88 F.Supp.2d at 301 ("[T]he language cited 'must *precisely* address the substance of the specific statement or omission that is challenged.' ") (citation omitted and emphasis added). "[W]arnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *Credit Suisse First Boston Corp.,* 2001 WL 300733, at *8.

### b. Application

As set forth above, the SAC alleges five misstatements and omissions in the Prospectus. For ease of analysis, each misrepresentation is treated as a subpart of Counts I and II.

### i. Statements Concerning the Ability of the System Modifications to Correct the Company's Billing Problems

■ The SAC alleges that the Prospectus falsely assured investors that the Company had modified software from a third party vendor that would correct the Company's billing problems. *See* SAC ¶¶ 153–56; *see also* Prospectus at 6 ("We have

modified the software by a third-party vendor in a manner that we believe now enables us to identify and correct faulty data and thereby bill our sub[-]100 kW customers in a timely and accurate manner.").[10] Defendants, however, contend that the statements in the Prospectus concerning the Company's software modifications are not actionable under both the bespeaks caution doctrine and the PSLRA's safe harbor provision. *See* Memorandum of Law in Support of the Underwriter and Related Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Underwriter Def. Mem.") at 17; Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Individual Def. Mem.") at 7–8. Specifically, the Prospectus warned that despite the software modification, the Company was "still experiencing delays in billing a portion of our customers," Prospectus at 6, and "there can be no assurances that the delays in billing that we have experienced with our customers to date will not continue to impact our new customers." *Id.* at 8–9.

Contrary to defendants' assertions, a reasonable juror could find that the statements in the Prospectus are not protected under the bespeaks caution doctrine.

Merely inserting warnings into a prospectus does not insulate a party from all liability for alleged material misstatements and omissions. *See In re Nokia Corp. Sec. Litig.*, No. 96 Civ. 3752, 1998 WL 150963, at *8 (S.D.N.Y. Apr.1, 1998). "[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made." *Milman*, 72 F.Supp.2d at 231. *See also In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").

Plaintiffs have alleged that at the time of the Secondary Offering, the Company already knew that the software modifications were not working and that its billing problems were getting worse.[11] *See* SAC ¶ 111. Therefore, the Company's warning of the hypothetical possibility that the software modifications may not solve its billing problems itself was false, which renders, the bespeaks caution doctrine inapplicable. *See Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir.1993) ("A prospectus stating a risk that such thing *could*

---

**10.** This precise language was repeated three times in the Prospectus. *See* Prospectus at 8, 18–19.

**11.** The Underwriter Defendants' contention that plaintiffs failed to plead with the required particularity that the Company knew that the software modifications were not working is unavailing. *See* Underwriter Def. Mem. at 19 n. 11. Even assuming that plaintiffs were held to the strict pleading requirements of Rule 9(b)—which would only apply to section 11 and 12(a)(2) claims that sound in fraud—plaintiffs have met its requirements. Plaintiffs learned from a confidential OFGEM source that at a meeting with OFGEM in

early March 2000, Sulley and the Company were told that the software modifications were not solving the Company's billing problems. *See* SAC ¶ 111. This allegation is sufficient at this early stage of the proceedings. *See Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.) (holding that plaintiffs need not reveal confidential sources at the pleading stage), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). Moreover, plaintiffs' allegation concerns the Company's knowledge, which goes to state of mind. *See* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally.").

happen is a far cry from one stating that this *had* happened. The former does not put an investor on notice of the latter.") (emphasis in original); *Milman,* 72 F.Supp.2d at 231.

Nor is the PSLRA's safe harbor provision applicable here. "[I]t is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply." *APAC Teleservice,* 1999 WL 1052004, at \*7 (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir. 1996)). The alleged forward-looking statement states that the Company "believe[s]" that the software modifications *"now* enables us to identify and correct faulty data." Prospectus at 6 (emphasis added). This constitutes a representation of present fact, not protected by the PSLRA's safe harbor provision. Moreover, plaintiffs have pled that the forward-looking statement was made with actual knowledge of its falsity. *See* SAC ¶ 111. Such allegations render the statements actionable. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 141 (S.D.N.Y.1999) (holding that statements based upon defendants' "beliefs" are actionable because there was "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs").

## ii. Statements Concerning the Causes of the Billing Delays

 Plaintiffs contend that the Company falsely attributed its billing delays to poor information flow from the RECs responsible for reading customers' meters, while the actual cause was poor performance of the Company's internal and external systems and procedures.[12] *See* SAC ¶¶ 151, 152. Indeed, plaintiffs allege that an OFGEM investigation determined that the RECs were not the cause of Independent Energy's billing problems. *See id.* ¶¶ 104, 152. OFGEM allegedly informed the Company of its findings in February 2000. *See id.* ¶ 104.

Defendants, however, contend that this allegation is not actionable for several reasons. *First,* defendants argue that the Prospectus informed investors that the cause of the Company's billing problems were its own and Vertex's software deficiencies. *See* Underwriter Def. Mem. at 16–17; Individual Def. Mem. at 10. The Prospectus states: **"We [the Company] depend on internal and third-party computer systems to process transactions with our customers**. . . . We have modified the software provided by a third party vendor in a manner that we believe now enables us to bill new customers in a timely and accurate manner." Prospectus at 8 (emphasis in original). While the Prospectus states that the Company's and Vertex's software systems were being modified, it also unequivocally states that "[t]he delays in billing have been caused by the quality and timing of data provided by the . . . RECs." *Id.* at 6. Moreover, the Prospectus casts the software modification as the Company's effort to remedy the problem allegedly caused by poor information and data provided by the RECs. *See id.* Therefore, a reasonable juror could con-

---

12. The Prospectus states:

The delays in billing have been caused by the quality and timing of data provided by the . . . RECs on the details of the meter installed at the customers [sic] premises and the opening readings of the meters. The problem has manifested itself in the form of missing information, the provision of the information in an untimely fashion, as well as multiple and different versions of each of the pieces of information and inconsistent forms of information among the RECs.

Prospectus at 6.

clude that the Company did not adequately disclose the cause of the billing delays.

*Second,* defendants contend that the Prospectus "bespoke caution" by extensively disclosing the risks associated with the Company's billing problems, and thus the actual cause of the Company's billing problems was immaterial. *See* Underwriter Def. Mem. at 17; Individual Def. Mem. at 10. For example, the "Risk Factors" section of the Prospectus warns:

> The inability to bill and collect revenues that have currently been recognized but not yet billed would have a material adverse impact on our financial condition and results of operations....
>
> If we continue to experience billing problems, we may not generate sufficient funds from our. operations to fund our expected growth, which will further increase our need for additional financings....
>
> If we are unable to bill on a timely and accurate basis a substantial number of new customers, we could experience: [ ] an inability to generate sufficient cash from operations to continue to grow our business; [ ] decreased customer service and satisfaction which could result in a loss of customers and therefore decreased revenues; and [ ] the incurrence of a substantial increase in our operating costs in order to improve our billing functionality.

Prospectus at 6–9.

Despite defendants' assertions, the bespeaks caution doctrine does not render the misstatements concerning the cause of the Company's billing problems immaterial. While the Prospectus warned investors of the risks associated with the Com-

pany's billing delays, it also downplayed the impact of those risks by misplacing the blame for those delays. By blaming its billing delays on the RECs, the Company implied that the billing problems are industry-wide and do not place the Company at a competitive disadvantage.[13] At this early stage of the litigation, where every inference must be drawn in plaintiffs' favor, a reasonable juror could conclude that a potential investor would find it material that the Company's billing problems were caused by the Company's internal problems, which would have put the Company at a competitive disadvantage.

### iii. Statements and Omissions Concerning the Company's Collection Problems

■ The Prospectus stated that "[t]he inability to bill and collect revenues that have currently been recognized but not yet billed *would have* a material adverse impact on our financial condition and results of operation." Prospectus at 6 (emphasis added). Plaintiffs contend that this statement was misleading because it presented the Company's collection problems as a hypothetical risk, rather than the present reality the Company was facing as a result of its lack of an adequate collection system at the time of the Secondary Offering. *See* SAC ¶¶ 103, 111; Pl. Mem. at 18.

Plaintiffs' argument is not convincing. While this one sentence in the Prospectus is presented as a hypothetical, the Prospectus disclosed that the Company had ongoing billing and collection problems. The Prospectus acknowledged that "[t]he delays in billing customers in the sub[-]100 kW market have significantly impacted our liquidity," and that "[i]f the billing problem

---

**13.** Indeed, the Prospectus emphasized that the RECs are responsible for providing data to Independent Energy's competitors as well. *See* Prospectus at 6 ("RECs are responsible for providing us with meter technical details and meter readings for all customers within their franchise area—this includes customers of our competitors (other RECs and independent suppliers) and also the supply business of the REC itself.").

persists, we may not be able to generate a sufficient amount of funds from operations to finance our electricity purchases from the Electricity Pool." Prospectus at 6, 7. Moreover, the Prospectus disclosed the Company's billing backlog at the time of the Offering: "From the inception of our marketing to the sub[-]100 kW market in March 1999 through December 31, 1999, we had billed less than 30% of revenue due for billing practices in the sub[-]100 kW market.... From March 1999 through February 27, 2000, we had billed approximately £89.9 million of the £163.5 million of revenue due for billing in the sub[-]100 kW market, which represents approximately 55%." Prospectus at 6. Plaintiffs have not alleged that these figures were false. The Prospectus therefore adequately disclosed the extent of the Company's billing and collection problems, and adequately warned investors that further billing problems would jeopardize the Company's liquidity. Accordingly, this statement in the Prospectus is not actionable. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996) ("Liability may not be imposed based on statements that, considered in their entirety, clearly 'bespeak caution.' ") (citation omitted).

### iv. Omissions Concerning the Company's Codes of Conduct and Third Party Service Provider

■ The Prospectus disclosed that "[i]f we are unable to bill on a timely and accurate basis a substantial number of new customers, we *could* experience ... decreased customer service and satisfaction which *could* result in a loss of customers and therefore decreased revenues." Prospectus at 9 (emphasis added). Plaintiffs maintain that this statement presented the Company's customer service problems as a hypothetical risk, rather than a current

problem. Indeed, the Prospectus failed to disclose the high level of customer complaints the Company was experiencing at the time of the Secondary Offering and that the Company was in violation of its codes of conduct because of its inability to respond to these complaints. *See* SAC ¶ 159. Additionally, plaintiffs contend that the Prospectus was misleading because it did not inform investors of Vertex's inability to handle the Company's billing needs. *See id.* ¶ 157.

Defendants contend that these omissions are immaterial because "disclosure that the Company could not timely and accurately bill its customers for over a year communicated to any reasonable investor that complaints *would ensue.*" Underwriter Def. Mem. at 15 (emphasis added). Defendants miss the point. Plaintiffs do not complain that the Prospectus did not disclose the possibility that complaints would ensue at some point in the future. Rather, plaintiffs contend that the Prospectus misrepresented the severity of the billing problems by failing to disclose that, at the time of the Secondary Offering, there was a high volume of complaints that the Company left unanswered. *See* SAC ¶ 159; Pl. Mem. at 21 n. 15. At this stage of the proceedings, a reasonable juror could conclude that the high volume of customer complaints and the Company's violation of its codes of conduct were material facts. *See Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 640 (3d Cir.1989) (failure to disclose company's violations of consumer protection laws and abnormally high level of consumer complaints lodged against company could be material); *Sutton v. Shearson Hayden Stone, Inc.,* 490 F.Supp. 98, 101 (S.D.N.Y.1980) (failure to disclose that broker had been the subject of previous customer complaints was material).[14]

---

**14.** Contrary to defendants' suggestion, plaintiffs do not complain of "non-actionable cor-

### v. Statements and Omissions Concerning the OFGEM Investigation

 Finally, plaintiffs allege that the Prospectus was misleading because "by the time of the Secondary Offering, the Company was aware that its worsening billing and customer service problems had subjected it to a formal investigation by OFGEM—the highest level of government investigation ... [and] that OFGEM had barred Northern Electric from taking on new customers for similar problems, and that it would likely be sanctioned by OF-GEM." SAC ¶ 150(a); see also Pl. Mem. at 22–25. Rather than inform investors of these facts, the Prospectus disclosed that the Company's "activities are subject to extensive laws and regulations ... primarily by ... OFGEM" and that "[a]ny change in the laws or regulations governing our business could adversely affect our operations and profitability." Prospectus at 9.

Drawing every reasonable inference in plaintiffs' favor, these allegations are material. See SAC ¶ 150(a); see also Pl. Mem. at 22–25. OFGEM's investigation involved the Company's sub-100 kW business, which represented 40% of the Company's customer base and was attractive to the Company because of its potential growth and high profit margins. See SAC ¶ 3. While defendants correctly note that the securities laws may not require disclosure of possible future sanctions, see Underwriter Def. Mem. at 12; see also Individual Def. Mem. at 12, they certainly require disclosure of information that would permit an investor to appreciate the risk that the future sanction may arise.[15] See Milman, 72 F.Supp.2d at 231. Therefore, a reasonable juror could find that an investigation of such an important aspect of the Company's business would have been material to a reasonable investor's decision to invest in the Company. See Klein, 937 F.Supp. at 327 (nondisclosure of governmental action that could affect funding for a large source of the company's operations was a material fact).[16]

Nevertheless, defendants argue that while "OFGEM's regulatory activities were not disclosed in the Prospectus, the possible outcome of those activities was disclosed." Individual Def. Mem. at 13. See also Prospectus at 10 ("If we are unable to correct our billing problems with our existing customers and if we continue to experience billing problems with our new customers, we will significantly limit our ability to grow our customer base."). This disclosure, however, was not complete because it did not indicate that the Compa-

---

porate mismanagement." Underwriter Def. Mem. at 15. The basis of plaintiffs' claim is not that they disagree with the Company's business choices, but rather, that the Prospectus failed to disclose known objective facts that existed at the time of the Secondary Offering. See In re Donna Karan Int'l Sec. Litig., No. 97 Civ.2011, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998) ("[T]he mere fact that the conduct in question arguably constitutes mismanagement will not preclude a claim under the federal securities laws if the defendant ... failed to disclose a specific material fact resulting from that mismanagement.").

**15.** The Prospectus' failure to forecast the outcome of OFGEM's investigation is not actionable. See Novak, 216 F.3d at 309 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim for securities fraud.").

**16.** Defendants' reliance on Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir.1995), and Robbins v. Moore Med. Corp., 894 F.Supp. 661 (S.D.N.Y.1995), is misplaced. Those cases involved routine inspections by the Food and Drug Administration. Nothing in the SAC suggests that OFGEM's investigation was in any way routine.

ny's inability to take on new customers might result from an investigation by a *government* regulatory body. Moreover, the disclosure did not permit a reasonable investor to appreciate the risk that the Company would ultimately have to agree to the OFGEM-imposed license because it did not inform investors that the Company was under "formal investigation" by OF-GEM. Accordingly, the failure to disclose that the Company was subject to an OF-GEM investigation and its possible consequences is actionable.

### 2. Plaintiffs' Standing to Sue Under Section 12(a)(2)

■ The Individual Defendants also seek to dismiss the section 12(a)(2) claim because they contend that plaintiffs lack standing to sue them. *See* Individual Def. Mem. at 14. The Individual Defendants argue that because the sale of Independent Energy ADSs was effectuated through the underwriters in a "firm commitment" offering,[17] Prospectus at 54–56, defendants cannot qualify as statutory "sellers" under section 12. *See* Individual Def. Mem. at 14.

■ Section 12(a)(2), as noted above, imposes liability on "any person who … offers or sells a security." 15 U.S.C. § 77*l*(a)(2). The term "seller" was defined by the Supreme Court in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), as the "owner who passed title, or other interest in the security, to the

buyer for value," or a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 642, 647, 108 S.Ct. 2063. Thus, even in a firm commitment offering, Sulley, Keenan, and Jones could be held liable as statutory sellers if plaintiffs demonstrate that they (1) solicited sales of the Company's stock; and (2) did so motivated by financial gain. *See Milman*, 72 F.Supp.2d at 229–30. The allegation of financial gain in the SAC—that these Individual Defendants stood to gain more than $30 million in capital from the Secondary Offering—is sufficient to meet the second prong. *See id.* at 230 (stating that financial gain prong is satisfied where defendants "received millions of dollars in profits from the Offering").

The central question, therefore, is whether Sulley, Keenan, and Jones "solicited" sales of their stock. Plaintiffs have alleged that these defendants made or participated in the decision to hire the Underwriter Defendants, drafted, disseminated and signed the Prospectus, and were control persons of the Company by virtue of their positions and equity ownership. *See* Pl. Mem. at 42; *see also* SAC ¶ 176. Furthermore, the SAC alleges that Sulley directly promoted the Company stock to analysts in a number of conference calls and press releases prior to the Secondary Offering. *See* SAC ¶¶ 193, 195. Such allegations are sufficient to constitute solicitation.[18] *See, e.g., APAC Teleservice*, 1999

---

**17.** In a firm commitment underwriting, the issuer of the securities sells all of the shares to be offered to its underwriters, who then sell those shares to the investors. *See Milman*, 72 F.Supp.2d at 229.

**18.** The Individual Defendants' contention that something more, such as active participation in a "road show", is necessary to constitute solicitation is not supported by the caselaw. *See* Individual Def. Mem. at 14 n. 6 (citing

*Milman*, 72 F.Supp.2d at 230). While several courts have held that a defendant solicits a sale of stock by promoting the offering and soliciting buyers at "road shows", *see, e.g., In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 438 (S.D.N.Y.2000); *Milman*, 72 F.Supp.2d at 230; *Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 790 (S.D.N.Y.1997), no court has established a per se rule that such activity is required.

WL 1052004, at *11 ("Courts have concluded that because the prospectus itself is a document that solicits the purchase of securities, those who sign the registration statement should be deemed persons who solicited the purchase of the offered securities."); *see also Capri v. Murphy*, 856 F.2d 473, 478 (2d Cir.1988); *In re Twinlab Corp. Sec. Litig.*, 103 F.Supp.2d 193, 204–05 (E.D.N.Y.2000); *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1315 (S.D.N.Y.1996). Accordingly, plaintiffs have alleged sufficient facts to assert a section 12(a)(2) claim against Sulley, Keenan, and Jones.

### B. Section 10(b) Claims

Plaintiffs also allege violations of section 10(b) and Rule 10b–5 promulgated thereunder against the Company, DLJ Securities, Sulley, and Keenan (Count IV). *See* SAC ¶¶ 187–227.

### 1. General Principles

■ To state a claim under section 10(b) and Rule 10b–5,[19] plaintiffs must allege that in connection with the purchase or sale of securities: (1) defendants made a false material misrepresentation or omitted to disclose material information; (2) defendants acted with scienter; and (3) plaintiffs detrimentally relied upon defendants' fraudulent acts. *See Ganino*, 228 F.3d at 161; *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999). In addition, claims arising under section 10(b)

are subject to the heightened pleading requirements of Rule 9(b):

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b); *see also Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) ("[T]he actual fraudulent statements or conduct and the fraud alleged must be stated with particularity."). However, the Court of Appeals has made clear that "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (quotation marks and citations omitted); *see also Acito*, 47 F.3d at 52. "Plaintiffs still have the 'burden of pleading circumstances that provide at least a minimal factual basis for their conclusory allegations of scienter.'" *Chill*, 101 F.3d at 267 (quoting *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir.1994)).

Motivated by a perceived need to curtail the filing of meritless lawsuits, Congress amended the Exchange Act through passage of the PSLRA. *See Novak*, 216 F.3d at 306. The PSLRA raised the nationwide pleading standard to that previously employed in the Second Circuit. *See id.* at 310. With respect to scienter, the PSLRA requires that

---

**19.** Section 10(b) makes it unlawful:

> [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5 sets forth specific practices that are considered "manipulative or deceptive." *See* 17 C.F.R. § 240.10b–5. Among other things, Rule 10b–5 provides that "[i]t shall be unlawful ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

[i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

 Although speculative and conclusory allegations will not suffice to plead scienter, the Second Circuit has made clear that "great specificity" is not required, so long as plaintiffs allege "enough facts to support 'a strong inference of fraudulent intent.'" *Ganino*, 228 F.3d at 169 (citing *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999)). *See also Novak*, 216 F.3d at 311 (PSLRA adopted Second Circuit's strong inference standard). Such an inference arises where plaintiffs allege either (1) facts showing that defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See Rothman*, 220 F.3d at 90.

### 2. The Section 10(b) Claim Against DLJ Securities

#### a. Actionable Misrepresentations

The section 10(b) claim against DLJ Securities arises solely out of the misrepresentations in the Prospectus. *See* SAC ¶ 210. Four of those misrepresentations are actionable under sections 11 and 12(a) of the Securities Act. *See supra* Part III. A.2. Similarly, only those misrepresentations listed *supra* Part II.C.1.a, b, d, and e are actionable under section 10(b) of the Exchange Act.

#### b. Scienter

DLJ Securities moves to dismiss the section 10(b) claim against it for failure to adequately plead scienter. *See* Underwriter Def. Mem. at 21–24. Plaintiffs contend that a strong inference of scienter has been adequately pled under both the recklessness or conscious misbehavior prong and the motive and opportunity prong.

#### i. Recklessness or Conscious Misbehavior

Plaintiffs maintain that the SAC adequately pleads recklessness or conscious misbehavior by DLJ Securities. *See* Pl. Mem. at 38–41. The essence of their claim is that because DLJ Securities was "intimately familiar" with the Company, SAC ¶ 200, its "failure to disclose what would have been obvious to anyone conducting due diligence" must have been reckless. Pl. Mem. at 38.

 The standard for pleading recklessness or conscious misbehavior is high. Indeed, "the strength of the circumstantial allegations must be correspondingly greater" when a plaintiff relies on allegations of recklessness, as opposed to allegations of motive and opportunity. *In re WRT Energy Sec. Litig.*, Nos. 96 Civ. 3610, 96 Civ. 3611, 1999 WL 178749, at *8 (S.D.N.Y. Mar.31, 1999) (citing *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987)).

The high standard for pleading recklessness was first announced in *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38 (2d Cir.1978), where the Second Circuit stated:

Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an *extreme departure* from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.

*Id.* at 47 (quotation marks and citation omitted, and emphasis added). The allegations of recklessness must be strong enough to give rise to a "strong inference of fraudulent intent". *Shields*, 25 F.3d at 1128.

■ The determination of whether a defendant acted recklessly necessarily depends on the facts of each case. *See Novak*, 216 F.3d at 308. Where the allegations of recklessness pertain to third-party advisers, such as underwriters or accountants, plaintiffs' allegations must be commensurately stronger, " 'approximat[ing] an actual intent to aid in the fraud being perpetrated by the [ ] company.' " *WRT Energy*, 1999 WL 178749, at *9 (dismissing claims against underwriter defendants for failure to adequately plead scienter) (quoting *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 121 (2d Cir.1982)); *In re Leslie Fay Cos. Sec. Litig.*, 835 F.Supp. 167, 173 (S.D.N.Y.1993) (outside auditor's recklessness must be shown to such an extent that a reasonable finder of fact could actually infer fraudulent intent from it). Allegations of conduct that demonstrate "merely simple, or even inexcusable negligence" are not sufficient to state a claim under the securities laws. *Manufacturer's Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 99 Civ.1944, 2000 WL 709006, at *3 (S.D.N.Y. June 1, 2000). Moreover, our Court of Appeals has emphasized that

> there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others. Thus, the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for [section] 10(b) liability. Similarly, the failure of a parent company to interpret extraordinarily positive performance by its subsidiary—specifically, the "unprec-

edented and dramatically increasing profitability" of a particular form of trading—as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws.

*Novak*, 216 F.3d at 309 (citations omitted).

■ Here, plaintiffs' allegations that DLJ Securities acted recklessly do not satisfy the high standard required to plead scienter. Plaintiffs' only basis for alleging that DLJ Securities was "intimately familiar" with the Company is the fact that it had previously served as the Company's underwriter and the fact that DLJ Inc. and DLJ International also had a business relationship with the Company. *See* SAC ¶ 220. However, DLJ Securities' status as the Company's underwriter cannot alone support an inference of scienter as every underwriter is "intimately familiar" with the issuing company. Nor is the conclusory assertion that DLJ Inc. and DLJ International were intimately familiar with the Company at all persuasive. While they had business relations with the Company, DLJ Inc. and DLJ International are not alleged to have had any special knowledge concerning the Company's management and operations. In short, plaintiffs fail to state any particularized facts that might support their assertion that DLJ Securities was so intimately familiar with the Company that it knew of the fraud being perpetrated on the public. Such "allegations of a close relationship fail to establish the kind of circumstantial evidence necessary to support a claim of fraudulent or reckless intent." *Vogel v. Sands Bros. & Co.*, 126 F.Supp.2d 730, 743 (S.D.N.Y. 2001). *See also Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1377 (S.D.N.Y.1996) (defendant's status as lead manager and underwriter of offering, as well as founder, substantial creditor, and shareholder of issuer, insuffi-

cient to plead recklessness or conscious misbehavior).

Plaintiffs also maintain that the misrepresentations in the Prospectus were obvious such that "[e]ven cursory due diligence or 'basic investigation' would have led DLJ Securities to the OFGEM investigation and all it concerned." Pl. Mem. at 40. Such allegations, however, that "if [defendants] had properly done their jobs as underwriters, they would have uncovered the truth about [the issuer]" constitute "negligence at best" and "have always been insufficient to establish scienter ...." *WRT Energy*, 1999 WL 178749, at *10; *see also Chill*, 101 F.3d at 270 ("Fraud cannot be inferred simply because GE might have been more curious or concerned about the activity at Kidder."); *Shields*, 25 F.3d at 1129; *Manufacturer's Life Ins.*, 2000 WL 709006, at *4.

While "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may *in some cases* give rise to an inference of ... recklessness," *Chill*, 101 F.3d at 269 (emphasis added, quotation mark and citation omitted), merely calling a misrepresentation obvious does not make it so. *See Feasby v. Industri–Matematik Int'l Corp.*, No. 99 Civ. 8761, 2000 WL 977673, at *7 (S.D.N.Y. July 17, 2000). To sufficiently plead scienter, something more than simply the bare incantation that a misrepresentation was obvious or that the defendant ignored information available to it is required. *See S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir.1998) (holding that pleading standard for recklessness was met where the corporate officer included false statements in S.E.C. filings despite the "obviously evasive and suspicious statements made to him" by the corporate officials upon whom he was relying and despite outside counsel's recommendation that these statements not be included). Rather, plaintiffs must offer particularized

allegations approximating an actual intent to aid in the fraud. *See Decker*, 681 F.2d at 121. This burden is satisfied, for example, where plaintiffs allege that the underwriters were present at meetings where undisclosed problems were discussed or where the underwriters recklessly disregarded documents that contradicted the misrepresentations. *See, e.g., Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F.Supp.2d 491, 505 (S.D.N.Y.2000). Plaintiffs' allegations fall far short of satisfying this burden. Accordingly, plaintiffs have not adequately pled DLJ Securities' recklessness or conscious misbehavior.

### ii. Motive and Opportunity

Alternatively, plaintiffs maintain that the SAC adequately pleads that DLJ Securities had a motive and an opportunity to defraud the public. DLJ Securities does not dispute that it would have had the opportunity to commit fraud if it were so inclined. Rather, DLJ Securities challenges the sufficiency of plaintiffs' motive allegations. *See* Underwriter Def. Mem. at 23–23.

 Motive is properly alleged by showing " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " *Ganino*, 228 F.3d at 170 (quoting *Shields*, 25 F.3d at 1130). As an initial matter,

> an underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a strong inference of fraudulent intent. If it were, every underwriter ... whose compensation or commission depended on the completion of an initial public offering would have a motive to commit fraud, which would make Rule 9(b) wholly meaningless.

*Fisher v. Offerman & Co., Inc.*, No. 95 Civ. 2566, 1996 WL 563141, at *6 (S.D.N.Y. Oct.2, 1996). *See also Vogel*, 126

F.Supp.2d at 743; *In re WRT Energy Sec. Litig.*, Nos. 96 Civ. 3610, 96 Civ. 3611, 1997 WL 576023, at *12 (S.D.N.Y. Sept.15, 1997) (collecting cases).

■■■ Recognizing this well-known principle, plaintiffs do not rely solely on the $5 million in underwriting fees obtained by DLJ Securities. Rather, plaintiffs contend that DLJ Securities was also motivated by the desire to provide enormous financial benefits to its parent, DLJ Inc. *First,* DLJ Securities allegedly knew that DLJ International, through the Secondary Offering, would unload each and every Independent Energy share it owned, netting $12.3 million in proceeds, which would directly benefit the parent, DLJ Inc. *See* SAC ¶¶ 36, 223. *Second,* because of the successful Secondary Offering, DLJ Inc. "escaped almost all of its liability on the £60 million ($85 million) credit line it had guaranteed" Independent Energy. Pl. Mem. at 35; *see also* SAC ¶¶ 114–16, 220.

DLJ Securities responds that DLJ Inc.'s financial incentives cannot be imputed to it as such an attempt to " 'boot strap' scienter by relying on a corporate affiliate's alleged motivation" has been rejected by the Second Circuit. Underwriter Def. Mem. at 23 (citing *Chill,* 101 F.3d at 268 ("the district court's determination that the [subsidiary and its employees] 'arguably' had a motive does not necessarily mean that the parent company, GE, had any motive. Ultimately, whether [the subsidiary] defrauded plaintiffs and whether its parent, GE, defrauded plaintiffs are different questions.")).

DLJ Securities' reliance on *Chill* is misplaced. There, the question was whether a subsidiary's motive to commit fraud is sufficient to state a section 10(b) claim against the parent corporation. Here, by contrast, the relevant question is precisely the inverse—whether it is sufficient to allege that the subsidiary was motivated by a desire to provide its parent corporation substantial financial benefits. This distinction is dispositive. Because a subsidiary acts only to please its parent, allegations of substantial concrete financial benefits to the parent are sufficient to plead the subsidiary's motive. Moreover, while a parent can control the activities of its wholly-owned subsidiary, a subsidiary has no power over its parent's operations and management. As the Supreme Court recognized in the antitrust context:

> With or without a formal "agreement," the subsidiary acts for the benefits of the parent, its sole shareholder. . . . [I]n reality a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight reign over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771–72, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (emphasis in original).

To put the matter more concretely, plaintiffs have also alleged that DLJ Inc. and DLJ Securities had overlapping management. *See* SAC ¶ 185. Specifically, DLJ Securities was allegedly run by an Operating Committee consisting of the three highest officers of DLJ Inc. *See id.* at 36–37. Therefore, DLJ Securities could have been motivated to secure enormous financial benefits for its parent of over $100 million through successful completion of the Secondary Offering. Accordingly, at this early stage of the proceedings, plaintiffs have adequately pled scienter as to DLJ Securities.

### 3. The Section 10(b) Claim Against Sulley and Keenan

#### a. Actionable Misstatements

The section 10(b) claims against the Company, Sulley, and Keenan are based

on their misrepresentations in the Prospectus, as well as their alleged misrepresentations in other publicly-made statements during the Class Period. *See* SAC ¶¶ 190–209. Specifically, plaintiffs complain of misstatements and omissions in thirteen of the Company's publicly-made statements. *See supra* Part II.C.2.

The Individual Defendants, however, contend that the misstatements alleged in paragraphs 195, 198, 199, 201, 202, and 203 of the SAC, *see supra* Part II. C.2.d, f, g, i–1, fall within the PSLRA's safe harbor provision for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). This argument is not convincing. Plaintiffs have alleged that in February 2000, the Company learned of OFGEM's conclusion that the billing problems were not caused by the RECs and were not an industry-wide problem. *See* SAC ¶ 104. Thus, the Company and Sulley knew or should have known that the statement in paragraph 195—that "the Company has put in place procedures to overcome the data problems which continue to affect the industry in general"—was false when made. Additionally, the statements in paragraphs 198, 199, and 201–203 of the SAC all reflect the overly optimistic view that the billing delays will soon be resolved. Plaintiffs have adequately pled that, at the time those statements were made, the Company and Sulley had no basis for such optimism and that such optimistic forecasts were contradicted by OFGEM and the relevant data. *See* SAC ¶¶ 205(a)-(e). Therefore, none of these misstatements fall under the PSLRA's safe harbor, *see Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 419 (S.D.N.Y.2000); *APAC Teleservice,* 1999

WL 1052004, at *7; *Oxford Health Plans,* 187 F.R.D. at 141, and each is actionable under section 10(b) of the Exchange Act.

Keenan also moves to dismiss the section 10(b) claims against him because plaintiffs have not alleged that he made any of the purported misstatements. Keenan is mistaken. *First,* assuming Keenan acted with the requisite level of scienter, *see infra* Part III.B.3.b, by affixing his name to the Prospectus, Keenan adopted the statements made therein and can be held liable for the alleged misrepresentations in the Prospectus. *See Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1061 (9th Cir.2000) ("[W]hen a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true.") (citing *In re JWP Inc. Sec. Litig.,* 928 F.Supp. 1239 (S.D.N.Y.1996)). As the Ninth Circuit recently stated: "Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements. Otherwise, the securities laws would be significantly weakened . . . ." *Howard,* 228 F.3d at 1061.[20]

*Second,* Keenan also can be held liable for the misrepresentations in the Company's other publicly-made statements under the group pleading doctrine. That doctrine is an exception to the requirement of Rule 9(b) that the fraudulent acts of each defendant be identified separately in the complaint. *See Polar Int'l Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). Group pleading allows plaintiffs to "rely

---

**20.** Keenan concedes in his reply memorandum of law that he can be held liable for the alleged misrepresentations in the Prospectus. *See* Reply Memorandum of Law in Support of the Individual Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Individual Def. Reply Mem.") at 8 n. 8.

on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Oxford Health Plans,* 187 F.R.D. at 142 (quotation marks omitted).

While the group pleading doctrine is narrow, it is sufficiently broad to encompass the allegations against Keenan. Generally, group pleading only applies to "clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." *Polar,* 108 F.Supp.2d at 237 (collecting cases). However, it may also apply to outside directors, who " 'although almost by definition [are] excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, . . . have access to information more akin to a corporate insider.' " *Hallet v. Li & Fung, Ltd.,* No. 95 Civ. 8917, 1996 WL 487952, at *4 (S.D.N.Y. Aug.27, 1996) (quoting *In re XOMA Corp. Sec. Litig.,* No. C–91–2252, 1990 WL 357807, at *5–6 (N.D.Cal. Dec. 27, 1991)).

Plaintiffs have alleged that Keenan, as a founder of the Company and its largest individual shareholder, was significantly involved with the Company's affairs. *See* SAC ¶ 212. Accepting this allegation as true, as required at this stage of the proceedings, Keenan was more akin to a "corporate insider" with a special relationship to the Company, rather than an outside director. *Cf. In re Complete Mgmt. Inc. Sec. Litig.,* No. 99 Civ. 1454, 2001 WL 314631, at *15 (S.D.N.Y. Mar.30, 2001) (holding, in context of control person analysis, that because defendant founded the company and was its largest shareholder he may be able to influence the company). Accordingly, the alleged misrepresenta-

tions in the Prospectus and the Company's other publicly-made statements may be attributable to Keenan.

**b. Scienter**

Sulley and Keenan also move to dismiss the section 10(b) claims against them for failure to adequately plead scienter. *See* Individual Def. Mem. at 16–20. Drawing every inference in plaintiffs' favor, scienter has been adequately pled against both Sulley and Keenan.

The allegations of the SAC demonstrate that as CEO of Independent Energy, Sulley was intimately aware of the Company's billing problems and the OFGEM investigation. Indeed, Sulley was present at the majority of the meetings with OFGEM. *See* SAC ¶ 213. Meetings he did not attend were attended by the Company's Directors of Regulation and Customer Operations, both of whom reported directly to Sulley. *See id.* Plaintiffs' allegations establish that Sulley knew or recklessly disregarded the fact that the Company's software modifications were not working, that the Company's problems were not industry wide, and that there was a high level of customer complaints which the Company was unable to answer. Accordingly, scienter is adequately pled against Sulley. *See In re Carter–Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 40 (2d Cir. 2000) ("It is sufficient for appellants to allege defendants' knowledge of facts or access to information contradicting their public statements.") (quotation marks omitted); *Complete Mgmt.,* 2001 WL 314631, at *9 (allegations that defendants were aware that a large percentage of company's receivables were ultimately uncollected and omitted this information in public statements adequately pled scienter).

Scienter is also properly pled as to Keenan under the "motive and opportuni-

ty" prong. Among other things, plaintiffs allege that Keenan was motivated by his desire to make a large profit in unusual insider trading activity. *See* SAC ¶ 216.

 It is well established that unusual insider sales at the time of the alleged corporate misrepresentations may permit an inference of bad faith and scienter. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. June 1, 2001); *Acito*, 47 F.3d at 54. The amount of profit realized from the sales, percentage of the insider's total holdings that are sold during the class period, and the number of insiders making such sales are all probative factors in assessing whether insider trading activity was sufficiently unusual to support an inference of scienter. *See Scholastic Corp.*, 252 F.3d 63, 74; *Complete Mgmt.*, 2001 WL 314631, at *12.

Here, Keenan was one of the largest shareholders of Independent Energy, owning approximately 1.16 million Ordinary Shares, or approximately 3.1% of the Company's Ordinary Shares. *See* SAC ¶ 27. In connection with the Secondary Offering, Keenan sold nearly 43% of his total holdings in Independent Energy at a price of $49.25 per share, netting $24.62 million in proceeds. *See id.* ¶¶ 27, 216. Furthermore, plaintiffs have alleged that the timing of Keenan's sales was "highly unusual". *Id.* ¶ 216. At the time of his sales, all of the analysts following the Company had BUY or STRONG BUY recommendations on the stock, with price targets in the $60 per share price range. *See id.* Finally, Keenan was not the only corporate insider who sold his shares of Independent Ener-

gy. In connection with the Secondary Offering, Sulley and Jones realized nearly $3 million each on sales of substantial portions of their holdings in the Company.[21] Keenan's sales are sufficiently widespread and substantial to qualify as "unusual" and thus constitute an adequate allegation of motive. *See Stevelman*, 174 F.3d at 85 (holding that a profit of $3.5 million in insider trading by the president and CEO of the company was sufficient to plead scienter because that corporate insider sold 40% of his stock holdings in the company and several other corporate insiders sold large positions in the company). Accordingly, plaintiffs have adequately pled scienter as to Keenan.[22]

## C. Control Person Liability

Plaintiffs also plead control person liability against the Individual Defendants and DLJ Inc. under section 15 of the Securities Act and against Independent Energy Holdings PLC, the Individual Defendants and DLJ Inc. under section 20(a) of the Exchange Act. *See* SAC ¶¶ 182–186, 228–233.

 Section 15 of the Securities Act and section 20(a) of the Exchange Act provide liability for every person who "controls any person liable" under sections 11 and 12(a)(2) of the Securities Act or section 10(b) of the Exchange Act. *See* 15 U.S.C. §§ 77o, 78t(a). To plead a prima facie case of control person liability under section 20(a), plaintiffs must allege: (1) an underlying primary violation of the securities laws by the controlled person; (2)

---

**21.** Sulley sold over 14% of his total holdings in the Company, while Jones sold nearly 17% of his total holdings in the Company. *See* SAC ¶¶ 28, 216.

**22.** Keenan argues opportunity was not specifically pled against him. *See* Individual Def. Reply Mem. at 9–10. Not only is this argu-

ment first raised in the Individual Defendants' reply memorandum of law, but it is unconvincing. Keenan served on the Company's Board, was a founder of the Company and one of its largest shareholders. A reasonable juror could conclude that Keenan had the opportunity to defraud the public.

control over the controlled person; and (3) that the controlling person was in some meaningful sense a culpable participant in the controlled person's primary violation. *See In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 413–17 (S.D.N.Y.2001); *Gabriel Capital,* 122 F.Supp.2d at 426.

The law is less clear, however, as to the requirements of a prima facie case under section 15. Several courts in this Circuit have not required a showing of culpable participation, but have required only a showing of control over the controlled person. *See, e.g., Silva Run Worldwide Ltd. v. Gaming Lottery Corp.,* No. 96 Civ. 3231, 2001 WL 396521, at *3 (S.D.N.Y. Apr.19, 2001); *Dorchester Investors v. Peak Int'l Ltd.,* 134 F.Supp.2d 569, 580–81 (S.D.N.Y. 2001); *Twinlab Corp.,* 103 F.Supp.2d at 207–08; *Degulis v. LXR Biotechnology, Inc.,* 928 F.Supp. 1301, 1315 (S.D.N.Y. 1996). Other courts in this Circuit have applied the section 20(a) analysis to section 15 claims and have required a showing of culpability. *See, e.g., Demaria v. Andersen,* 153 F.Supp.3d 300, 313 (S.D.N.Y. 2001); *American Bank Note Holographics,* 93 F.Supp.2d at 441; *Ellison v. American Image Motor Co., Inc.,* 36 F.Supp.2d 628, 637–38 (S.D.N.Y.1999).

■ As previously noted, claims under sections 11 and (12)(a)(2) of the Securities Act sound in strict liability and do not require knowledge of the misrepresentations. The concept of culpability is therefore inapposite. *See Twinlab Corp.,* 103 F.Supp.2d at 207–08. Instead, to plead control person liability under the Securities Act, it is sufficient to allege an underlying primary violation of the Securities Act and control over the controlled person. *See Degulis,* 928 F.Supp. at 1315.

### 1. Application to DLJ Inc.

■ DLJ Inc. first argues that plaintiffs have not adequately pled that it is a control person. *See* Underwriter Def. Mem. at 24. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *S.E.C. v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996) (quoting 17 C.F.R. § 240.12b–2). Actual control over the wrongdoer and the transactions in question is necessary for control person liability. *See Cromer Fin. Ltd. v. Berger,* 137 F.Supp.2d 452, 484 (S.D.N.Y.2001). To survive a motion to dismiss, a plaintiff need only plead facts supporting a reasonable inference of control. *See Gabriel Capital,* 122 F.Supp.2d at 426; *Mishkin v. Ageloff,* No. 97 Civ. 2690, 1998 WL 651065, at *26 (S.D.N.Y. Sep.23, 1998).

■ Here, plaintiffs have alleged that DLJ Inc. conducts its business domestically and internationally through its wholly-owned subsidiaries, including DLJ Securities and DLJ International. *See* SAC ¶¶ 185, 232. Plaintiffs further argue that DLJ Inc. "was running the business of DLJ Securities through common management." Pl. Mem. at 36. Specifically, plaintiffs allege that the three highest officers of DLJ Inc. were on the Operating Committee that ran DLJ Securities. *See id.* at 36–37. Plaintiffs have pled sufficient facts supporting an inference that DLJ Inc. controlled DLJ Securities and DLJ International. *See Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,* 735 F.Supp. 587, 591 (S.D.N.Y.1990) (holding that control person liability adequately alleged because as the sole shareholder of the subsidiary, the parent corporation "had the potential power to influence and direct

the activities of" its subsidiary). Therefore, plaintiffs have adequately pled a control person liability claim against DLJ Inc. under section 15 of the Securities Act.

This, however, does not end the inquiry with respect to plaintiffs' section 20(a) claim against DLJ Inc., which requires a showing of culpable participation. The Second Circuit has not yet addressed the meaning of "culpable participation" at any length, other than to state that "a determination of [section] 20(a) liability requires an individualized determination of a ... defendant's particular culpability." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir.1998). Several cases applying this standard have relied on both a showing of fraudulent conduct—that is, that the control person has in some meaningful sense participated in the underlying fraud—and culpability—that is, that the control person acted with the requisite state of mind—to conclude that the culpable participation element has been satisfied. *See, e.g., Oxford Health Plans*, 187 F.R.D. at 143 (denying motion to dismiss section 20(a) claim where defendants "held high level management positions in which they were involved in the day-to-day operations of Oxford, were aware of the internal control and accounting problems, were members of the Board, held substantial equity interest in Oxford, allegedly participated directly in disseminating the false and misleading financial statements and other statements, and traded while in possession of material non-public information.").

■ Because the culpable participation element requires plaintiffs to prove the controlling person's state of mind, the PSLRA's heightened pleading requirements apply. *See Cromer Fin.*, 137 F.Supp.2d at 484; *Gabriel Capital*, 122 F.Supp.2d at 427. To satisfy the state of

mind portion of the culpable participation element, plaintiffs may plead either conscious misbehavior or recklessness. *See Gabriel Capital*, 122 F.Supp.2d at 428. Therefore, plaintiffs must plead with particularity "facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Id.*

■ A controlling person need not be a section 10(b) actor in order to culpably participate in the primary violation. *See id.* at 429. Rather, "[b]y failing to exercise its control to prevent the primary violation, the controlling person is 'in some meaningful sense a culpable participant in the primary violation.'" *Id.* at 428 (quoting *Boguslavsky*, 159 F.3d at 720). Therefore, plaintiffs need only plead that the controlling person failed to take any action to prevent the primary violation by the controlled person. *See Gabriel Capital*, 122 F.Supp.2d at 429.

■ Plaintiffs have failed to plead particularized facts demonstrating that DLJ Inc. culpably participated in DLJ Securities' primary violation of the Exchange Act. Plaintiffs maintain that "[a] sufficient inference of DLJ's culpable participation ... is supported by the numerous concrete benefits it received in connection with the Secondary Offering ...." While allegations of such motive are sufficient to sustain an inference of scienter under section 10(b), *see supra* Part III.B.2.b.ii, they do not demonstrate that DLJ Inc. was a culpable participant in DLJ Securities' primary violation.[23] Plaintiffs have not provided any particularized facts as to what DLJ Inc. allegedly knew of DLJ Securi-

---

**23.** Plaintiffs have failed to cite a single case where the culpable participation prong has been satisfied solely based on allegations of the controlling person's financial motive.

ties' activities or of the Company's misrepresentations or problems. Indeed, plaintiffs have not even asserted that DLJ Inc. "knew or should have known" of the fraud being committed. Nor have plaintiffs provided any details as to what DLJ Inc. is alleged to have done or failed to do as a participant in DLJ Securities' primary violation. *See Mishkin,* 1998 WL 651065, at *26 ("[T]he Complaint must provide some detail about what [the controlling person] is alleged to have done, and when he did it, in order for [the court] to hold that the Complaint provides 'particularized facts' of [the controlling person's] culpable participation."). Because of the absence of any such allegations or particularized facts, the section 20(a) claim against DLJ Inc. must be dismissed.

### 2. Application to the Individual Defendants

 It is well established that officer or director status alone does not constitute control. *See In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 221 (S.D.N.Y. 1999) (collecting cases). Here, in addition to pleading their status as directors, plaintiffs also allege that the Individual Defendants held substantial equity in the Company and signed the Prospectus. *See SAC* ¶ 230. Such allegations are sufficient to prevent dismissal of this claim as a matter of law. *See In re Quintel Entm't Inc., Sec. Litig.,* 72 F.Supp.2d 283, 298 (S.D.N.Y. 1999) (control alleged where complaint specified that the high-level executive defendants had access to internal documents and public filings, and had the ability to prevent issuance of and to correct the statements); *see also* IV Louis Loss & Joel Seligman, *Securities Regulation* 1728–29 (3d ed.2000) (stating that whether a person's status as an officer or director makes him a controlling person may require "a fairly extensive inquiry into the entire relationship of the particular officer

or director to the rest of the managing group"). As Judge Victor Marrero of this Court recently stated:

> An outside director ... who is in a position to approve a corporation's financial statements can be presumed to have "the power to direct or cause the direction of the management and policies of" the corporation, at least insofar as the "management and policies" referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign. 17 C.F.R. § 240.12b–2. For, by placing liability on directors and other controlling persons[,] the statute contemplates not only giving plaintiffs an additional source of redress to recover losses caused by corporate misrepresentations. It also seeks indirectly to foster accountability by imposing a penalty on those who are in a position to monitor the truthfulness of corporate public representations and establish standards to that end, but fail to do so, to the detriment of the corporation's investors.

*In re Livent, Inc.,* 2001 WL 740673, at *56. Accordingly, plaintiffs have adequately pled a section 15 claim against the Individual Defendants.

 Plaintiffs, however, have not adequately pled a claim of control person liability against the Individual Defendants under section 20(a) of the Exchange Act. The SAC contains no allegations of culpable participation on the part of Oakes, Jarrell, Jones, or Stewart. Plaintiffs sole allegation against them is that they failed to make a "reasonable investigation ... that the statements contained in the ... Prospectus for the Secondary Offering were true and devoid of any omissions of material fact." SAC ¶ 184. Such allegations amount merely to negligence, and do not rise to the level of recklessness or conscious misbehavior. *See In re Livent,*

*Inc.*, 2001 WL 740673, at \*53 ("[A]ny failure on the part of the Outside Directors to investigate further may be suggestive of negligence, but not of the extreme departure from ordinary care required to constitute recklessness."); *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374, 1999 WL 101772, at \*16 (S.D.N.Y. Mar.01, 1999) ("[J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence."); *Cf. WRT Energy*, 1999 WL 178749, at \*10 (allegations that underwriter failed to discover company's fraud constitute only negligence). Plaintiffs' allegations against Oakes, Jarrell, Jones, and Stewart are conclusory and speculative, and certainly do not give "rise to a strong inference that … [they] knew or should have known that [the Company] was engaging in fraudulent conduct, but took no steps to prevent the primary violation." *Cromer Fin.*, 137 F.Supp.2d at 484 (quotation marks and citation omitted). Accordingly, the section 20(a) claim against Oakes, Jarrell, Jones, and Stewart is dismissed. *See Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569, 2001 WL 286757, at \*11 (S.D.N.Y. Mar.23, 2001) ("[W]here a complaint contains no detailed allegations regarding the state of mind of the 'control person,' a [s]ection 20(a) claim must be dismissed for failure to allege culpable participation.").

## IV. LEAVE TO AMEND

While plaintiffs have not requested leave to amend any deficient claims, the decision whether to grant leave to amend rests within the sound discretion of the district court. *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990). Pursuant to Rule 15(a), leave to amend a complaint "shall be freely granted when justice so requires." *See Cortec Indus.*, 949 F.2d at 48 ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."). However, plaintiffs need not be granted leave to amend where amendment would be futile. *See Marchi v. Board of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir.), *cert. denied*, 528 U.S. 869, 120 S.Ct. 169, 145 L.Ed.2d 143 (1999); *Chill*, 101 F.3d at 272.

In keeping with the liberal spirit of Rule 15, plaintiffs may amend their control person claims if they can cure the defects set forth herein. However, leave to amend is denied with respect to plaintiffs' claim that the statements and omissions in the Prospectus concerning the Company's collection problems are actionable as any amendment would be futile. The Prospectus adequately disclosed the Company's collection problems and bespoke caution that the collection problems may significantly impact the Company. *See supra* Part III.A.1.b.iii.

## V. CONCLUSION

For the reasons stated above, defendants' motions to dismiss are granted in part and denied in part with leave to amend. A conference is scheduled for August 14, 2001 at 4:00 p.m.[24]

SO ORDERED.

---

**24.** Counsel for lead plaintiffs are responsible for distributing this Opinion to all plaintiffs' counsel.